[PHILADELPHIA, MARCH 31, 1835.]

## Case of AUSTIN and others.

An attorney at law holds his office during good behaviour, and is not professionally answerable for a scrutiny into the official conduct of the judges, which would not expose him to legal animadversion as a citizen.

An assertion contained in a letter expressed in respectful language and addressed to a President Judge, by attorneys practising in his court, that the court had lost the confidence of the public and the suggestion of his retirement as the means of restoring it, do not affect the course of the judge's public duty, and cannot be deemed a breach of professional fidelity on the part of the attorneys, which will authorise the court to strike their names from the list of attorneys.

Still less can they be so deemed, where the letter was in answer to one written to them by the judge, in which he had spoken to them of discipline relaxed, and disorder introduced in the conduct of business in court; of inadvertent remarks indicative of contempt for his decisions, and calculated to impress the public mind unfavourably to the court, and to himself as its organ; of giving place to a successor, who might obtain their confidence and co-operation, and in which, he had, in conclusion, solicited an expression of their sentiments and determination as to the future, in relation to the grievances he had presented.

Nor is the character of the transaction altered by the publication of the correspondence in a public newspaper, by the attorneys, not for the purpose of assailing the reputation of the judge, but of defending their own.

THIS case came before the court in pursuance of an act of assembly passed on the 14th day of March, 1835,(*Pam. L.* 70,) by which the Supreme Court of this Commonwealth was authorised and required to take jurisdiction of a certain record and proceedings in the Court of Common Pleas of the county of Fayette, of the term of January, one thousand eight hundred and thirty-five, whereby the names of eight attorneys were, on the eighth day of January, one thousand eight hundred and thirty-five, ordered to be struck from the list of attorneys of the said court; and that the said Supreme Court shall, with as little delay as possible, and during their session commencing at the city of Philadelphia on Monday the sixteenth of March, one thousand eight hundred and thirty five, proceed to hear and determine the questions arising upon the said record and proceedings in any shape, which may be approved or prescribed by the court; and shall cause the decision of the said Supreme Court to be duly certified to the Court of Common Pleas in the county of Fayette; and make all orders, and direct all measures which may be necessary and proper, and which shall be effectual in the premises.

The following is a copy of the record and proceedings of which the Supreme Court was directed to take cognizance.

Fayette County, ss.

At a Court of Common Pleas, &c. held at Union-town, in and

for the county of Fayette, the sixth day of January, in the year of our Lord one thousand eight hundred and thirty-five, before the Honourable Thomas H. Baird, Esquire, President, and Charles Porter and Samuel Nixon, Esquires, Associate Judges of the same Court.

The Court grant a rule upon *John M. Austin, John Dawson, Joshua B. Howell, John H. Deford, Joseph Williams, Alfred Patterson, Robert P. Flenniken, Rice G. Hopwood, William McDonald* and *William P. Wells,* Esquires, to show cause why they should not be stricken from the list of Attorneys of this Court.

Copy of the letter above referred to.

Union Town, Pa., Oct. 3d, 1834.

Dear Sir,—

We have delayed replying to your letter under date of the 12th of September, 1834, addressed to the members of the bar of Fayette county, until the present time, to afford an opportunity for consulting together, and also for mature reflection upon the matters to which you refer. We regret, in common with your honour, that we have not been able, in harmony and with satisfaction to ourselves and the people of the county, to transact the business of our courts. The public confidence seems to be withdrawn alike from the bar and the Court. Perhaps your honour's retiring from the bench, as you have intimated a willingness so to do, and giving the people the power to select another, would be the means of producing a better state of things, and a more cordial co-operation from all sides in the despatch of the business of the county. This expression of our views is made in candour and sincerity, without a wish to inspire one unpleasant thought or unkind feeling, but under a sense of duty to the county in which we live, to your honour and to ourselves.

Very respectfully, yours, &c.

| | |
|---|---|
| *John M. Austin,* | *A. Patterson,* |
| *John Dawson,* | *R. P. Flenniken,* |
| *Joshua B. Howell,* | *R. G. Hopwood,* |
| *J. H. Deford,* | *Wm. McDonald,* |
| *J. Williams,* | *W. P. Wells.* |

Post marked " Union Town, Pa., November 7." Directed " Thomas H. Baird Esq., Williamsport, Washington county, Pa."
Filed 6th January, 1835.

*Answer of the Respondents to the foregoing rule.*

The undersigned who are required by a rule of Court, entered this day to show cause why they should not be stricken from the list of Attorneys, present this their answer to that rule.

We earnestly, but respectfully protest against the legal power and

(Case of Austin and others.)

authority of the Court to enter and enforce such a rule for the cause alleged.

The rule appears to be founded and predicated on the letter of the undersigned, addressed to Judge BAIRD, dated October 3d, 1834. To enable a full understanding of the whole matter, a letter of Judge BAIRD, dated September 12, 1834, is herewith presented.

It is evident that the letter of the undersigned which contains the supposed offensive matter, is a reply and response to the letter of Judge BAIRD to them addressed. It is, certainly respectful in its terms, and as is sincerely believed and positively asserted, contains neither in words, meaning nor intention, the slightest contempt, or the least disrespect to the Court or any of its members.

The respondents would be entirely at a loss to comprehend how it could be possible to give their letter, from its terms, an offensive interpretation, were they not informed from another source, that the following paragraph is considered objectionable:—"*the public confidence seems to be withdrawn alike from the bar and the Court.*" We, by this paragraph, expressed our honest conviction, and intended no contempt to the court. It is a response in some measure to that part of Judge BAIRD's letter, in which he himself says, that the circumstances to which he refers were calculated to make "*a lodgment in the public mind injurious to the authority and respectability of the court, and particularly of himself, its organ.*"

It will also be perceived from the two letters referred to, that the correspondence did not take place between the bar and *the court,*—it was between the respondents and Judge BAIRD, at his instance and request. The occurrence, asserted as constituting some undefined offence, did not take place in presence of the court—it took place out of court, and *in pais.*

Far, very far, therefore, are we from being guilty of any offence against *the Court.* As to Judge BAIRD, personally, the letter distinctly and unequivocally states that our views were "*made in candour and sincerity, without a wish to inspire one unpleasant thought or unkind feeling.*"

| | |
|---|---|
| John M. Austin. | J. H. Deford, |
| John Dawson, | Wm. M'Donald, |
| Joshua B. Howell, | J. Williams, |
| Wm. B. Wells, | R. P. Flenniken, |
| Alfred Patterson, | R. G. Hopwood. |

Copy of the letter from Judge BAIRD, to the gentlemen of the bar, referred to in the above answer.

Friday, Sept. 12, 1834.

Gentlemen :—

You have no doubt long been aware that the occurrence of a variety of disagreeable circumstances in the conduct of our business in

(Case of Austin and others.)

court, has rendered my situation often exceedingly painful and perplexing. It is possible I have had my full share in the causes which have led to this state of things. I think, however, upon reflection, you will be satisfied that in a great degree, it has been owing to the irregular manner of the bar in the trial of causes. It is unnecessary to go into particulars at this time. It has been the subject of complaint and of conflict, distressing to me and unpleasant to you. Finding a remedy hopeless without your aid, I have frequently brought my mind to the conclusion, that perhaps I ought to withdraw and give you the opportunity of getting in my room some other gentleman, who would have your confidence and co-operation. This determination has heretofore been yielded to the advice of friends, upon whose judgment I have relied.

Early in the present week I requested an interview with you, that we might talk these matters over, and perhaps agree to a united effort for reform. You were prevented from meeting as proposed. In the mean time, the occurrence of a brutal attack upon me by a ruffian, growing out of a trial in court, has more and more convinced me of the necessity of coming to some conclusion, that may prevent the repetition of such outrages. On this subject I wish not to be misunderstood. The act of a brute or bully can never drive me from the post of duty or of honour. I thank God that in the performance of my official functions, I have been preserved from the operation of *fear*, as I hope I have been from the influence of favour or affection. I never, I repeat, have been deterred by any apprehension of personal danger, although I have often been aware of *peril*. I have known that there was cause for it. The inadvertent, but as I think, indiscreet indulgence of side-bar remarks, indicative of dissatisfaction with the decisions of the court, and perhaps sometimes of contempt, has been calculated to make a lodgment in the public mind, injurious to the authority and respectability of the court, and particularly of myself, as its organ, and has had a direct tendency to rouse the malignant passions of a disappointed or defeated party. I have often observed, or been informed of these things, and have thought they might lead to disastrous consequences. A correct, judicious man, if he thinks his case has not been correctly decided, will seek redress in the legitimate mode only; or, if that is not accessible, (which seldom happens,) will submit to it, as we all do to unavoidable misfortunes. A ruffian, however, if told by his counsel that injustice has been done him in the administration of the law, may feel disposed to seek vengeance on the Judge. In the case referred to, I think the *cause* and *effect* can be distinctly traced. The earnestness and positiveness of the counsel on the trial, and expressions thoughtlessly dropped afterwards, perhaps inflamed an unprincipled fellow to make an attack. It may be, however, that it would not have occasioned it, had he not been encouraged by other persons. I have only my suspicions, and make no charge against

(Case of Austin and others.)

any one.   I exculpate the counsel in that case, and I exculpate the whole bar from the most distant idea of producing such a catastrophe.   All that I mean to say, is, that the practice I have mentioned has a direct tendency to incite to such outrages; and that in the particular case, (in connection with other causes,) it did lead to the violence.

The same cause may produce the same effect.   I must be always exposed to such consequences, if matter of excitement continues to be furnished to wrong-headed, brutal suitors.   If I could have the confidence and support of the bar, and the assurance of a change in their manner towards each other and towards the Court, in the public conduct of business, the office I hold would be rendered dignified, honourable and pleasant; but otherwise, it must become altogether intolerable.   On my part, there is no want of good feeling, and I take this occasion to declare, that there is not one of you for whom I entertain unkind sentiments.   On the contrary, there is no one whose interests I would not advance, or whose honour I would not maintain, so far as in my power.   As to myself, I have no right to claim your *friendship*, though I should be glad to have it; but I think in the discharge of my official duties, I ought to have your courtesy and respect; and when I err, forbearance, in manner, and recourse discreetly to the proper remedy, (which I am always disposed to facilitate,) and not to inflammatory expressions of disapprobation or contempt addressed to the public or the party.

I have thus disclosed to you frankly my feelings and views.   In reply, I wish your sentiments and determination as to the future in relation to the grievances I have presented, and propose, therefore, that you should take a few minutes to confer together, and inform me of the conclusion to which you may arrive.

I am truly yours, &c.

THOS. H. BAIRD.

Messrs. *Ewing, Todd, Dawson,* and the other gentlemen of the bar of Fayette county, present.

Second answer of the respondents.

January 7th, 1835.

The undersigned, after reiterating the protest contained in a former answer, make this further reply to the rule entered yesterday against them.

When the former answer was prepared, it was not known that the publication of the correspondence between the bar and Judge BAIRD, in the newspapers, constituted a portion of the supposed offence against the court, the record not presenting that aspect of the case.

They now reply to this matter, and to cause a more perfect understanding thereof, they present herewith a letter from Judge BAIRD

(Case of Austin and others.)

to the undersigned, dated December 15, 1834. We now ask that the three letters on record may be carefully examined, in connexion with our former answer to the *rule to show cause.* We cannot but think that the court will then be satisfied that the last letter of Judge BAIRD, contains imputations and strictures not warranted by any thing said in our communication to him, when properly understood.

In some way, the existence of the controversy reached the public ear. It immediately assumed a false shape in connexion with an assault committed upon the Judge by a suitor in court. Misapprehension about the nature of the correspondence was produced. For want of correct information, false assertions were made, and false inferences drawn. It became a public matter, involving seriously public interests. The correspondence related to public affairs. The letters by no means being private and confidential, we considered it our imperative duty, in justice to ourselves and in justice to the public, to lay the whole correspondence, as it really was, before the whole community. It was accordingly done, and for the purposes intimated. The court will clearly perceive, that in this act there was no offence committed against the court, but it was a proceeding rendered every way necessary, as it gave the true state of the controversy, and supplied the place of false rumors in relation both to Judge BAIRD and ourselves.

| | |
|---|---|
| *John Dawson,* | *J. Williams,* |
| *John M. Austin,* | *R. G. Hopwood,* |
| *Wm. P. Wells,* | *A. Patterson,* |
| *Joshua B. Howell,* | *R. P. Flenniken.* |
| *J. H. Deford.* | |

(Copy of a letter from Judge BAIRD to the respondents, dated 15th December, 1834, and referred to in the above answer.)

Harlem, December 15, 1834.

Messrs. *Austin, Dawson, Howell, Deford, Williams, Flenniken, Hopwood, M'Donald,* and *Wells,* members of the Fayette county bar.

Your communication, dated 3d October, (post marked November 7th,) which purports to be an answer to my letter of 12th September, came to my hand on Saturday night last. It had been withheld from me by my friends, during my recent illness, from an apprehension it might produce an increased excitement prejudicial to my health. In this they were mistaken. I have experienced too much of the ills of life, and have at present too many other causes of agitating concern, to be greatly disturbed by it. Perhaps, were it not for the knowledge of human nature, which I have dearly bought, I might have been surprised and pained to receive such a paper from persons standing to' me in the relation that you do, not one of whom I have ever intentionally injured in

(Case of Austin and others.)

thought, word or deed. I was, however, prepared for such an
" *expression of your views,*" though there are some signatures I did
not expect to see. Had your letter been framed immediately in
answer to mine, and put into my hands at the time, I do not know
what course I might have adopted in the hurry of my feelings. I
certainly have often entertained the thought of leaving my situation,
influenced by a regard to my personal comfort, and I will add, also,
from considerations towards you that spring more from my heart
than my head. This purpose I have often yielded to the judgment
and advice of friends. I have also repeatedly said, that, unless a
reform could be effected in the mode of doing business in court, I
would not continue in the office. Immediately after the occurrence at
the last term, to which I referred in my letter, I hastily expressed my
intention never to return to the county. This purpose was formed
not on account of the immediate outrage, (which I was aware I could
sufficiently punish,) but because I believed (as I still do,) that the
ruffian was instigated by others. It is not in my recollection that I
declared in my communication to you, any present design of aban-
doning my office at your request; and I am confirmed in this idea,
from the fact, that a judicious friend strongly remonstrated against
such an intimation being given. But if I had even so expressed
myself, subsequent reflection, long before I received your letter, had
abundantly convinced me that it would be wrong to do so at this
time and under the circumstances in which I am placed in my official
relation to you and to the people. The station I hold is not mine—
nor is it yours—it belongs to the public, and has been conferred
upon me (without my solicitation,) by the constitutional agent.
Unless from private considerations I think proper to give it up, (and
the right to do so is recognized by law,) it cannot be taken from me,
but in the way the people have designated. It would be a violation
of *their rights,* and a dereliction of duty, if I could be constrained or
influenced to abandon it by any other process. I am now satisfied
that I ought not to have addressed you as I did. It was compro-
mising the dignity of the office entrusted to me to *solicit* from you a
*reform* in your manner of conducting your business at the bar, when
I ought to have compelled it. In concurrence with my brother
judges, I should have prescribed the order and discipline of the
court, and enforced obedience. This error, however, also proceeded
more from my heart than my head; and you are the last persons in
the world who ought to complain of it. Henceforth it will be my
endeavour to correct this mistake; and, depend upon it, if there is
not a *reform* without making it a matter of *compact* with you, it will
not be *my* fault. But however I might be disposed to resign my
office from motives of private convenience and peace of mind,
(which I have a right to do,) or perhaps from a wish to indulge you
in a desired preference for some other person in my stead, (the pro-
priety of which I now doubt,) yet still the terms of your communi-

(Case of Austin and others.)

cation entirely preclude me from doing so, without yielding my personal and judicial honour.

You undertake to assert that "*the public confidence seems to be withdrawn alike from the bar and the court.*" If the first part of the proposition is to be understood as an admission of the state of things in relation to yourselves, it is not my business to combat it;—but I deny your right or warrant to make the latter allegation. It is of grave import and deliberately set forth, as you took time, as you say, "*to afford an opportunity for consulting together and also for mature reflection.*" It is the basis of your request that I should resign; for the other matters, in relation to the manner of conducting the business of the court, you were well aware it was in your power to adjust. Undoubtedly, therefore, it involves a charge of *official delinquency;* such as would warrant the removal of the judges, either by impeachment or address. "Public confidence" is indeed the foundation on which must rest the usefulness, respectability and authority of the courts: if that is destroyed, all that is valuable in our judicial institutions must fall, and the personal honour of the judges be involved in the general ruin. To weaken or impair, then, that *faith* which the people ought to have in the integrity and capacity of those who administer their laws is a great *public mischief.* Certainly there is no way more calculated to produce such a result than to assert that *such is the present fact.* The laws will not allow that the people have 'withdrawn' 'their confidence' from their judicial agents, unless it has been so ascertained in the mode prescribed in the constitution. It cannot be tolerated that the official standing of the judges is to be tested by the sneering remarks we may hear in the streets, or by the vituperation of bar-room censors. I leave it to you, therefore, as a matter of professional opinion, to say, whether it would not be *indictable* as a *libel* for any one to publish in writing that the "*public confidence is withdrawn*" *from a court.* Perhaps, when members of the bar so far forget the "*fidelity*" to which they are bound as to promulgate such a declaration, a discreet but decisive exercise of the summary power vested in the judges, over the conduct of their own officers, may be considered the most obvious and proper course. On this point it would be premature in me to express an opinion now. Your communication will be before us at the next term, and after deliberate examination and hearing, the decision of the court will be pronounced. There is another matter which I think it proper to apprise you of, with the hope that a satisfactory explanation will be offered. I have understood that a report is in circulation, emanating from some of you, that I have charged the *whole bar* with being concerned in the outrage lately committed upon me. If it is true that such an idea has been thrown abroad, it is so base a perversion of my language, that I cannot conceive the malignity of the heart that could engender it. When such means are employed to excite popu-

(Case of Austin and others.)

lar prejudice, it would not be surprising if ' public confidence' *should* be ' withdrawn' from *me* at least.   My letter will show for itself; and I defy the ingenuity of Satan himself, to make out any such thing, on the contrary, I think it contains a distinct " *exculpation of the whole bar from the most distant thought of producing such a catastrophe.*"   The whole matter in relation to that outrage will be before the court at their next term, and the associate judges will be called upon to sustain and assert the violated authority and dignity of the judicial office, by the exercise of their summary power of punishing such gross contempts.   At the last sitting I made up my mind to take no step myself, as it might be thought I acted under excited feelings : and the public prosecutor, who is considered as particularly representing the people in relation to such things, did not think proper to present to the court the propriety and necessity of this course.   It is, however, indispensable ; for a judicial tribunal that cannot protect itself without resorting to another tribunal for aid or redress, must cease to exist.

In conclusion I will only say that upon " *mature reflection*" it is my determination *not to resign* at *present;* and that it is also my abiding determination *never to resign* upon the *ground stated in your letter.*   I hope to be able to take my seat on the bench in Fayette county on the first Monday of January next.   If I have lost any degree of the public confidence, it shall be my endeavour to regain it, by a faithful performance of my judicial functions.   With the aid of my brother judges, I will try to preserve the order and discipline of the court, by a discreet but energetic exercise of the power which the law gives us; and perhaps you may be satisfied that the *laxity* which has, no doubt, been a considerable cause of complaint, was more owing to my kind feelings towards you, than to any want of moral courage to encounter the consequences that may result from the honest discharge of public duty.   I shall perform my official functions with a sincere desire to *do right,* and shall expect from the members of the bar, that they behave themselves " *with all good fidelity to the court as well as to the client.*"

I am, &c.     Th. H. Baird.

(Separate answer of *William M<sup>c</sup>Donald.*)

" On the subject of the difficulty between the bar and the court, I take the liberty of making the following statement.   I was opposed to the publication of the correspondence from the beginning, and have frequently so expressed myself, thinking it would have a tendency to widen the breach without being calculated to do any good. From first to last I have been free from the control of any intention to cast disrespect or contempt upon the court or any of its members.

*William M<sup>c</sup>Donald.*

(Opinion of the court.)

" In the matter of *John M. Austin, John Dawson, Josh. B. Howell,*

(Case of Austin and others.)

Wm. P. Wells, Alfred Patterson, J. H. Deford, Wm. M'Donald, J. Williams, R. B. Flenniken and Rice G. Hopwood, attorneys.

January 6, 1835, rule to show cause why they should not be stricken from the list of attorneys of this court.

January 8th, 1835, opinion of the court.

BAIRD, President.—The court has given to the papers presented by the respondents in this case, the most careful consideration and the most favourable construction their import would at all admit. It is with the deepest regret, we are constrained to say that they are by no means satisfactory. We cannot regard them as removing the offensive and injurious operation of the matter which has been published to the world in relation to this court, and which forms the gravamen of the rule. All that we have required is, that the gentlemen would distinctly place in their answer a disavowal of any intention to impute to the court or its members any thing which would lower them (in their official character) in the esteem and confidence of the people. This has been, and is still refused. No alternative therefore remains. We must abandon our judicial honour, respectability, and authority, or endeavour to sustain them in what we conceive to be the legitimate mode.

It is not the common law, or statutory power to punish *contempts* which we are about to exercise. It is the coercive control and discipline which the courts have always legally employed in order to preserve in the members of the bar the observance of that trust, courtesy and respect, which is indispensable to the safe and orderly administration of justice. An early act of assembly, (22d May, 1722) declares that attorneys, if they misbehave, shall be liable " to suffer such pains, penalties and suspensions, as attorneys at law in Great Britain are liable to in such cases." And by an act of last session, " If any attorney shall misbehave himself in his office of attorney, he shall be liable to suspension, removal from office, or to such other penalties as have hitherto been allowed in such cases by the laws of this commonwealth."

By these acts the power of the courts here is the same as is exercised by the courts in England; we consider it unquestionable whenever there is "*misbehaviour*" in an "*attorney*." The exercise of this power is a judicial act, and although it is *summary*, yet it can no where be so safely lodged, both as respects its prompt and efficient application when necessary, and also as respects the security and interest of the members of the bar, who have always the feelings and attachment of the judges with them, when they conduct themselves with propriety.

The term "*misbehaviour*" in our acts of assembly, has an evident relation to the official oath of an attorney, He is sworn to "*behave*" himself with all good fidelity to the *court* as well as to the *client.* What does this include? as between *counsel* and *client*, it seems to be well understood. A lawyer would not betray the *interest* or the

(Case of Austin and others.)

*fame* of the man who has given him a paltry fee, nor would the law allow him to do so in any case in which he is engaged. Does it not import *anything* as respects the court? Can an attorney be tolerated in publishing to the world that "*public confidence is withdrawn from the court*," and then come in and claim to stand in that relation which the law contemplates as essential to the decorous, orderly administration of the public business. If so, we do not understand the meaning of the word "*fidelity*," or the relation it creates.

In this case we think there has been "*misbehaviour*" on the part of the gentlemen against whom the rule is granted. The publication in relation to the court we consider a libel. It has been done in their office of attorney, as they themselves show. The whole matter refers to the public relation between the court and the bar. The first letter of the president, was in truth an act of the whole court, for although signed by him, it was with the concurrence of his brother judges. It was intended as a kind appeal to their good sense and generous feelings, and by no means as insinuating any imputation more than occasional inadvertant side-bar remarks and other irregularities, as the letter plainly imports. It was communicated in a private manner because it was thought more likely to produce a good effect, than a public address. They in all their proceedings and in their answers, speak of it in their official relation. The only question then, is—does their conduct amount to "*misbehaviour*," and to what degree? We think it does, and to such an extent of aggravation, as virtually to destroy the relation of "*fidelity*" which must exist towards the court, by the members of the bar. If that relation is extinguished and no longer exists, the official connection must necessarily be dissolved; otherwise the spirit of the law is violated.

As we have no personal feelings to indulge (except those of regret,) we forbear any harsh commentary upon the matters involved. We would leave it to the calm reflection and better feelings of the gentlemen themselves, and would hope that they may yet be induced to avail themselves of the door which is still open to a returning sense of duty. We have no appeal to make to the public, except what a just estimate of our rectitude of purpose may present to their virtue and good sense.

It is ordered that the names of *John M. Austin, John Dawson, Joshua B. Howell, Wm. P. Wells, Alfred Patterson, John H. Deford, J. Williams and R. P. Flenniken* be struck from the list of attorneys of this court.

In the case of *William M'Donald* the rule is discharged.
In the case of *Rice G. Hopwood*, the rule is continued.

Judge Nixon dissented from the decisions of the court as follows.

January Term, 1835.

" The court enter a rule on certain members of the bar therein

(Case of Austin and others.)

mentioned, to show cause why they should not be stricken from the list of attorneys, for making or causing to be made certain publications calculated to bring the court into disrepute, to which they have responded.

I concur with my brother judges that certain parts of said publications are calculated to bring this court into disrepute with the people, and ought to be punished ; but taking into consideration the cause that elicited or drew forth those publications, and the concessions and explanations that have been made by the respondents to the court, the penalty of an indefinite suspension would be very severe.    Had our rule been left open so as not to require a specific punishment, I would have been very happy in co-operating with my brother judges in inflicting some adequate punishment, if any, but as there is no alternative, I must dissent from their judgment, and think the rule ought to be discharged.

SAMUEL NIXON.

(Separate answer of *Rice G. Hopwood*, Esq.)

January 9th, 1835.

Present judges PORTER and NIXON.

In answer to the rule granted by the court upon the members of the bar to show cause why they should not be stricken from the list of attorneys, the undersigned candidly but respectfully submits the following reply as to the publication.

That he intended no contempt of court, nor did he intend to call in question, in any shape, the integrity of their official conduct, or detract from their standing in the estimation of the public.

*Rice G. Hopwood.*

By the Court.—The rule in the case of *Rice G. Hopwood* is discharged.

The record being thus before the Supreme Court, the eight gentlemen of the bar whose names had been stricken off the list, appeared with the leave of the court by their attorneys, and suggested for its hearing and determination the questions presented by the following—

*Bill of Exceptions.*

*First.* The court of Common Pleas of Fayette county erred in considering the said attorneys, as the authors of a letter to the Hon. T. H. BAIRD, under date of the 3d October, 1834, liable to the penalty of being struck from the roll for an alleged libel upon the court.

*Second.* The Court below erred in considering that by the writing or publishing of the said letter, the said attorneys did " misbehave themselves in their offices of attorneys" respectively.

*Third.* The Court below erred in considering that by the writing

or publishing of the said letter the said attorneys had departed from their obligation " to behave themselves in the office of attorney within the court according to the best of their learning and ability, and with all good fidelity, as well to the court as to their clients."

*Fourth.* The order of the Court below that the names of the said attorneys be struck from the list, is unconstitutional, illegal and oppressive, and the same should be forthwith reversed and annulled.

These questions were fully argued by *Dallas* and *J. R. Ingersoll* on behalf of the gentlemen of the bar; and by

*J. Sergeant* in support of the proceedings of the Court of Common Pleas of Fayette county.

The opinion of the court was delivered by

Gibson, C. J.—An attorney at law is an officer of the court. The terms of the oaths exacted of him at his admission to the bar, prove him to be so; "you shall behave youself in your *office* of attorney within the court, with all due fidelity as well to the court as the client." Again: it is declared in the Constitution, article 1, sec. 18, that " no member of Congress or other person, holding any *office,* (except *attorney at law,* and in the militia,) under the United States or this Commonwealth, shall be a member of either house (of the legislature,) during his continuance in Congress, or in office," which is a direct constitutional recognition. And his office is an office for life. Though recognized by the Constitution as we have seen, it is without limitation of duration by the terms of admission to it, by the provisions of the constitution, or by any statute. The grant of an office without express limitation, at common law being taken most strongly against the grantor, endures for the life of the grantee; and though this principle has not been applied to offices within the grant of the executive, it must necessarily be applied to the office of attorney, for to subject the members of the profession to removal at the pleasure of the court, would leave them too small a share of the independence necessary to the duties they are called to perform to their clients and to the public. As a class, they are supposed to be, and in fact have always been, the vindicators of individual rights, and the fearless asserters of the principles of civil liberty; existing where alone they can exist, in a government not of parties or men, but of laws! On the other hand, to declare them irresponsible to any power but public opinion and their consciences, would be incompatible with free government. Individuals of the class may, and sometimes do, forfeit their professional franchise by abusing it; and a power to exact the forfeiture must be lodged somewhere. Such a power is indispensable to protect the court, the administration of justice, and themselves. Abuses must necessarily creep in; and having a deep stake in the character of their profession, they are vitally concerned in preventing it from being sullied by the miscon-

(Case of Austin and others.)

duct of unworthy members of it.  No class of the community is more dependent on its reputation for honour and integrity.  It is indispensable to the purposes of its creation to assign it a high and honourable standing, but to put it above the judiciary, whose official tenure is good behaviour, and whose members are removable from office, by the legislature, would render it intractable; and it is therefore, necessary to assign it but an equal share of independence. In the absence of specific provision to the contrary, the power of removal is, from its nature, commensurate with the power of appointment, and it is consequently the business of the judges to deal with delinquent members of the bar, and withdraw their faculties when they are incorrigible.

But the end to be attained by removal, is not punishment, but protection.  As punishment, it would be unreasonably severe, for those cases in which the end is reclamation and not destruction, and for which reprimand, suspension, fine or imprisonment seem to be the more adequate instruments of correction; for expulsion from the bar, blasts all prospects of prosperity to come, and mars the fruit expected, from the training of a lifetime.  For this reason, the statute to regulate attachment and summary punishment for contempts, seems to be inapplicable to this class of cases.  Expulsion may be proper, where there has been no contempt at all; as in cases of brutality, drunkenness, and the whole circle of infamous crimes.  It is one thing to remove from office, for unfitness, and another to punish for contempt.  In fact, the court may have recourse to both together, and there is no reason, therefore, why it should not be at liberty to proceed on the ground of unfitness, and waive the contempt.  It is not doubted that any breach of the official oath is a valid cause, for proceeding for the former ; for the man who deliberately violates the sanctions of a lawful oath, proves himself to be unworthy of further confidence; society has no other hold upon him. The most insignificant breach of the fidelity enjoined may, therefore, be visited with this measure.  But it is supposed that as this fidelity is exacted by the terms of the oath, but " in the office of attorney," and " within the court," the act which may violate it, must be done in the face of the court.  The oath undoubtedly looks to nothing like allegiance to the person of the judge, unless in those cases where his person is so inseparable from his office, that an insult to the one, is an indignity to the other.  In matters collateral to official duty, the judge is on a level with the members of the bar as he is with his fellow citizens, his title to distinction and respect resting on no other foundation than his virtues and qualities as a man. But it is nevertheless, evident that professional fidelity may be violated by acts, which fall without the line of professional functions, and which may have been performed out of the pale of the court. Such would be the consequence of beating or insulting a judge in the street for a judgment in court.  No one would pretend that an

(Case of Austin and others.)

attempt to control the deliberations of the bench, by the apprehension of violence, and subject the judges to the power of those who are, or ought to be subordinate to them, is compatible with professional duty, or the judicial independence so indispensable to the administration of justice.   And an enormity of the sort, practised but on a single judge, would be an offence, as much against the court, which is bound to protect all it members, as if it had been repeated on the person of each of them, because the consequences to suitors and the public would be the same; and whatever may be thought in such a case, of the power to punish for contempt, there can be no doubt of the existence of a power to strike the offending attorney from the roll.

It is equally obvious that an attempt to overawe the bench by menace, challenge, or the employment of an engine so powerful as the press, is an offence of the same stamp, the difference being but in the means of committing it.   It may be said the judge is bound to despise consideration of danger or annoyance, and do his duty manfully without regard to consequences.   The law however deals differently with human infirmity, and provides for the influence of those hopes and fears which are in a greater or less degree inseparable from our nature.   Moral courage, to an ordinary extent, is certainly a necessary qualification for the bench; but physical courage is no more a qualification, than animal strength or prowess in fighting.   The enormity of breaking the peace by assaulting its official conservators, which might be sufficient evidence of professional disqualification, without recourse to the purpose to be gained by it, would be wanting in the case of a libel, unless it were a very gross one; and therefore the motive should be clearly shown to have been the acquirement of an influence over the judge in the exercise of his judicial functions by the instrumentality of popular prejudice. Does the existence of professional responsibility for libel, when thus limited and guarded, impinge on the liberty of the press?   The conduct of a judge, like that of every other functionary, is a legitimate subject of scrutiny, and where the public good is the aim, such scrutiny is as open to an attorney of his court as to any other citizen.   It is the prostitution of it to impure purposes, that can bring him into collision with his professional fidelity.   Even a battery might be committed by an attorney on a judge consistently with the official relation, if provoked in matters of social intercourse.   It is the motive therefore that makes an invasion of the judge's rights a breach of professional fidelity; from which he is to be protected for the sake of the public and the suitors of his court, not for his own. To impair the general confidence in the purity and efficiency of the administration of distributive justice, is a vital injury to it; and the attorney who abuses the public credulity with a view to that effect, cannot complain if the faculties from which his capacity for mischief is mainly derived, be taken away from him.   The sum of the mat-

(Case of Austin and others.)

ter is, that an attorney at law holds his office during good behaviour, and that he is not professionally answerable for a scrutiny into the official conduct of the judges, which would not expose him to legal animadversion as a citizen.   Such being the principle, it is necessary to ascertain the form and pressure of the case, to which it is to be applied.   The ground of disrespect laid by the President of the Common Pleas, is the letter sent to him by the respondents.   The rule to show cause was laid without specification of cause for expulsion, except that this letter was then put on the record, and undoubtedly as containing the matter to which they were required to respond.   It was only when told that the publication of the correspondence would be insisted on as a separate charge, that they put in a supplementary answer to it, and having been treated as such there, it is to be treated as such here.

But nothing was said of the prefatory matter, which introduced the correspondence to the public; nor was the newspaper which contains it, even filed.*   It is doubtful, therefore, whether it can

---

\* The prefatory matter spoken of, by the Chief Justice, was published, with the correspondence, in the *Pennsylvania Democrat, published in Uniontown, Fayette County,* on the 31st of December, 1834, and is as follows:

" *To the People of Fayette County.*

" The following correspondence between Judge BAIRD, and the members of the bar of Fayette county, is submitted for publication, under the belief, if it has any interest it belongs to the people of the county.

" Immediately after the assault upon the Judge at the last term, he declared that he considered the attack upon him as the act of Fayette county, and that he had no doubt that two-thirds of the people of Uniontown knew that it would be made before it took place—that he would never hold another court in the county—that he would resign. These declarations, the bar believed, had been made by the Judge.   They feel confident there was no foundation for the charge against the people of Uniontown, or the county, and knew well none existed to justify the imputation against themselves.

" They were also informed that the Judge had written a most violent letter involving them in the criminality of the assault upon him, but which he suppressed at the instigation of his friend, and in its stead wrote the one below.

" The members of the bar felt exceedingly mortified that it should enter into the mind of any rational being to connect them in any form or shape with the assault upon Judge BAIRD, yet it is the burden of his whole letter that the misbehaviour and improper conduct of the bar produced the assault upon him.   This is the sentiment it breathes from beginning to end.   When the bar, however, learned that he entertained similar sentiments toward the people of Uniontown, and perhaps the whole county, they declined from self-respect to notice the letter in any other manner than as contained in their answer.   It is firmly believed that not an individual inhabitant of Uniontown had the slightest intimation of such a design in *Stevens.*   The act was deeply regretted, and the most prompt measures taken to bring the offender to trial.   He was instantly seized, and taken before a magistrate.   The public prosecutor immediately repaired to the Justice's office, and remained to see that the defendant was effectually bound to appear at the next court, to answer to the laws, for the act.   This was all that could be done, or that was supposed could be done.   Not a single suggestion was there made that any other steps were necessary, or lawful, to secure the punishment of the defendant.   The Judge asked the opinion of the bar, and they gave it.   If he compromised " the dignity of his office," in addressing his letter to them, they would have compromised their own dignity and honour in answering it in any other than the language of truth, and their own honest conviction: whether they did so or not is freely left to the people to decide."

be treated as a part of the case.   For myself I should say it cannot. The additional matter put upon the record by the respondents, consists of two letters addressed to them by the president, the first being that which elicited the offence of the respondents, and the second a reply to it.   The case is then made up of these three letters, the fact of publication, and possibly the prefatory remarks which accompanied it.   Now, without taking into view the solicitation of an interchange of views contained in the president's first letter, the assertion that the Court had lost the confidence of the public and the suggestion of his retirement as the means of restoring it, might be deemed an impertinence; but not affecting the course of his public duty, it could not be deemed a breach of professional fidelity.   But looking to the terms of his letter, we find their expressions to be but an echo of his own.   He had spoken to them of discipline relaxed and disorder introduced ; of inadvertent remarks indicative of contempt for his decisions, and calculated to impress the public mind unfavourably to the Court and himself its organ ; and of giving place to a successor who might obtain their confidence and co-operation. His design to do so, he had spoken of as having been yielded to the advice of his friends, but not as having been relinquished; and in conclusion, he had solicited their views in reference to the future.   These sentiments were expressed neither in the words nor in the connexion in which I have arranged them ; but it is evident they were considered in this connexion by the respondents in framing their reply.   " The public confidence" they said, " seems to be withdrawn alike from the bar and the Court.   Perhaps your honour's retiring from the bench, as you have intimated a willingness to do, and giving the people power to select another, would be the means of producing a better state of things, and a more cordial co-operation from all sides, in the despatch of the business of the Court.   This expression of our views is made in candour and sincerity, and without a wish to inspire one unpleasant thought or unkind feeling, but under a sense of duty to the county in which we live, to your honour and to ourselves."   Surely these expressions breathe any thing but contumely.   It is alleged that a memorial presented to the Court a few months before, and signed by five of the eight respondents, and the remarks prefixed to the correspondence, evince a different state of feeling.   To a mind exasperated by a sense of outrage, it would naturally appear so ; but the impression would be effaced by reflection.   The memorial being no part of the case, is to be laid out of view ; but we are bound by a sense of what is due to the occasion to express no less than painful surprise, to learn that gentlemen whose professional intercourse with us has been superior to all exceptions, have participated in scenes elsewhere, whose reminiscences can furnish no subjects of gratulation or sentiments of self-respect.   The remarks prefixed to the correspondence were doubtless written in an angry temper ; but as the contest had assumed a character of deter-

(Case of Austin and others.)

mined hostility, they were not fairly indicative of the temper that prevailed before; and whatever may have been the secret motive of the respondents, the language of their letter is bland and respectful.

The character of the act of publication depends on the motive for it. Was the object of the respondents to assail the reputation of the president or to defend their own? I am unable to understand why it should have been supposed the former; for there is nothing in the correspondence to disparage him as an officer or a man, though labouring under evident, but excusable excitement, his language was temperate and courteous, the measure proposed alone being badly chosen. The officer who parleys with resistance, proposes terms of capitulation. A better, and the only effectual cure for the disorders of his court, would have been a firm, but temperate and equable application of authority to the refractory, and the prompt expulsion of those who braved it. Had the respondents been removed from office for actual insubordination, their case would have been a clear, but hopeless one. But they have earnestly and uniformly protested, that the object of the publication was not to affect the judge, but to disabuse the public mind; and professing this to be their motive, it seems to me that in the absence of evidence to disprove it, we are bound to receive it as the true one. They too acted from the impulse of excitement, for which allowance is to be made, believing, as they say they did, that the president had implicated them in the disgraceful assault on his person. But what seems to be entitled to a decisive influence in a legal view, is the fact, that the publication was made by them, not as members of the bar, but as persons put upon their defence, by an intimation that they were to be dealt with criminally. In that predicament, to entrench themselves in popular prejudice, may have been wrong in them as men, but certainly involved no dereliction of professional duty. In conclusion, it appears that a case to justify the removal of the respondents, has not been made out; and it is therefore considered that the order which made the rule absolute be vacated, and the rule discharged; that the respondents be restored to the bar; and that this decree be certified to the Common Pleas of Fayette county.

Decreed accordingly.