## No. 2281.—ADELE GERNON et als. *v.* DAVID C. McCAN.

One who alleges extinguishment of his debt by payment, must prove it.

Payment of a debt which is to be acquitted in money, may be made by a third person not interested, C. C. 2160; Dig. 46, 3, 53; but this payment must be the deliberate and intentional act of this third person, for payment is not merely the delivery of a sum of money, but the performance of an obligation; an act calling for the exercise of the will—of consent; without which it has not the characteristics of that mode of extinguishing obligations.

When, therefore, it appears as matter of fact, that a third person acted as agent, both for the makers of notes who desired an extension, and for a party who wished to purchase them as an investment, and consented to the extension; and this agent paid the money, believing that he was purchasing the notes, and the extension was accordingly made: Held—That the transaction would not be considered a payment, merely because the person who received the money imagined that he received it in payment.

APPEAL from the Second District Court, parish of Orleans. *Thomas*, J. *Semmes & Mott* and *Hays & New*, for plaintiffs and appellants. *R. H. Marr*, for defendant and appellee.

Howe, J. This suit was instituted by heirs of William Mish and Oliver Dubois to annul a judgment obtained against the executors of Dubois and the administratrix *pro tempore* of Mish by the defendant, McCan, on certain mortgage notes. It was contended by the plaintiffs that the notes had been paid and extinguished long before McCan brought his suit. This payment was denied by the defendant, who averred himself to be the owner and holder of the notes in good faith, for value, and before maturity.

There was judgment for defendant, dismissing the suit, and dissolving the injunction which the plaintiffs had obtained, with $2800 damages, and the plaintiffs have appealed.

The main question for our decision is, whether or not the notes in question were paid, and thus extinguished, as alleged by plaintiffs. There is no question of the validity of these obligations originally. They were given for borrowed money in 1859, and were secured by

mortgage on valuable property on St. Charles street. They amounted in the aggregate to $28,000 and were to fall due March 18, 1862. It seems that about a month before their maturity, McClellan, the executor of Dubois, one of the makers, and the agent of Mish, the other maker, finding that the notes could not be met when due, sent the witness Yenni to Mr. Kruttschnitt, the agent of William Vogel, the owner of the notes, to negotiate for an extension. The agent agreed to extend, "at current rates," which seem to have been ten per cent. per annum. McClellan sought to do better than this, and opened negotiations with Moore, a broker, who represented a party named Stone, who had money to invest and was willing to give time for payment at five per cent. per annum. In his testimony Moore says:

Dubois and Mish wanted me to have the notes extended; they could not pay them at maturity; I went to the holders of the notes several times to find out about the rate at which they would be willing to extend them; I told the agent of Dubois and Mish that it would be eight per cent. for the extension, and they told me to see if I could not do any better. * * I made arrangements at five per cent. (for) two years; I acted as broker for McClellan; he had a power of attorney to act for them, (the makers), and before the notes were extended he had to bring his power to the notary.

I went to the holders of the notes and told them I had made better terms for Dubois and Mish, and would take the notes up in a few days, which I did, and had them extended before W. L. Poole, notary.

Question. Where did the money come from to take up the notes; whose money was it?

Answer. It was money of William Stone.

Q. That was the money you gave to Mr. Kruttschnitt?

A. Before the notes were negotiated the trade was made with Stone in the first place, but as he was going to leave, he made the arrangement with Major Hardy.

Q. But in the matter you acted as broker or intermediary of the parties?

A. Yes, sir.

Q. How was the payment made; how did you get possession of the notes?

A. I went to Mr. Kruttschnitt's office and tendered the money. He told me he wished I would go to the bank and have it deposited, as he was not a very good judge of money. He asked me to go with his young man, and then he would know it was all right, if it was put to his credit in the bank.

Q. And you did go and deposit the money to his credit?

A. Yes, sir.

Q. And then he gave you the notes?

A. Yes, sir.

Q. And you gave the notes to Mr. Stone?

A. I gave the notes to the party who made the negotiation in the meantime, to Major Henry.

Q. And this renewal was in pursuance of the original agreement under which you took up these notes?

A. Yes, sir, I had possession of the notes all the time until they were extended.

The witness further says of the notes:

I bought them before the maturity. They were extended by this act before Poole, and then there was this renewal of the eighteenth March, 1864, for two years.

He then testifies to the further extension of the notes to March 18, 1867, by the defendant, McCan, who had bought them from witness's firm for about their face value in lawful money.

The two notarial extensions are in evidence, and memoranda thereof are indorsed on the notes. The last extension is indorsed by a memorandum in the handwriting of a partner of Moore.

We do not understand that there is any dispute respecting the facts thus far stated, or any doubt of the truthfulness of the witness whose testimony we have quoted.

On the part of plaintiffs, Kruttschnitt, the agent of Vogel, who was holder of the notes in the early part of March, 1862, testified.

Q. Were these notes ever paid to you, if so, when and where?

A. I got the money on the eleventh of March, (1862), I believe, from Mr. Moore; it was Confederate money. The notes were deposited in the Citizens' Bank.

Q. Had there been any effort made to pay these notes while in the Citizens' Bank?

A. I should think so from the fact that the person—I believe Mr. Moore or some one else—came to me and said he must withdraw the notes from the bank because the bank could not receive Confederate money without a written authorization.

Q. When the money was paid to you, did you make a sale of the notes to the person who paid the money; did you make a transfer of your rights to him, or did you deliver up the notes as to a person who was paying them?

A. I delivered them as to a person who was paying them.

Q. You never sold the notes at all for Confederate money?

A. Certainly not.

Q. Did you want to receive payment in Confederate money?

A. I took legal advice about receiving Confederate money, and the opinion was, I could not be forced to receive it, and that if I instituted a law suit, I might recover in gold and silver. He (the lawyer) said:

"'That is my advice as a lawyer; now I will give you my advice as a friend "—and that advice was to take Confederate money, because at that time it was very dangerous to refuse to take Confederate money. One of my personal friends was very nearly lynched for refusing to receive it. About a month or so before this I was applied to to renew those notes. There was no rate stipulated, but I told them I would renew the notes at the rates ranging in the market at the date of maturity. I gave my consent to renew the notes, but no rate was agreed on."

It is not necessary to consider the effect of the use of Confederate money in this case, since the original consideration of the notes was lawful and valuable. 21 An. 513. The main point relied upon by plaintiffs is that the notes were paid in March, 1862, and thus extinguished, and that they are entitled to the benefit of this fact, although neither they nor their ancestors nor their ancestors' representatives have ever paid a farthing, and, despite the fact that the executors, agent and administratrix we have named, never made any such plea, but permitted the judgment sought to be annulled to be recovered without defense.

It is true that the payment of a debt which is to be acquitted in money, is permitted to be made by a third person, even one not interested. The right thus to pay is absolute; it may be exercised not only against the will of the creditor, but without the knowledge and even against the opposition of the debtor; because on the one hand the creditor has no interest and consequently no right to refuse a regular and satisfactory payment, and it is a matter of indifference whence the money comes, and because, on the other hand, it is permitted to every one, by a kind of "fraternal mandate," to ameliorate the condition of another, even without his knowledge and against his will. Larombiere on Obligations, vol. 3, p. 66. Thus Gaius decided: " Solvere pro ignorante et invito cuique licet, cum sit jure civili constitutum licere etiam ignorantis invitique meliorem conditionem facere," Dig. 46, 3, 53; and this rule of the Roman law has been continued in article 1236 of the Code Napoleon and in the corresponding article 2130 of the Code of Louisiana.

But it seems equally clear that the payment thus permitted must be the deliberate and intentional act of the third person who makes it; that this provision of law is not meant to entrap the unwary; and that one who, like Stone or Henry, sends his broker to buy negotiable paper, shall not find that paper turning to ashes in his grasp, as by a sort of legal sorcery, simply because the person to whom he gives his money erroneously imagines that the transaction is a payment, and not a purchase. In the case of Bloodworth v. Jacobs, 2 An. 26, this court said in regard to payment: "It is not only the delivery of a sum of

money, but the performance of an obligation.   It is an act calling for
the exercise of the will, of consent, without which it has not the char-
acteristics of that mode of extinguishing obligations;" and we are sat-
isfied that there was no such consent in the case at bar.   We might
even doubt if Kruttschnitt was justified in forming the opinion of the
nature of the transaction, which he expressed in his testimony.   He
knew the makers required indulgence and extension.   He knew that
Moore was a broker negotiating for an extension, and that he had made
better terms with other parties than he (Kruttschnitt) would grant.
He had no reason to imagine that Moore delivered him the money "in
the name and for the discharge of the debtors;" but he was aware that
the money came before the maturity of the notes.    Should it not have
seemed strange to him that debtors who were praying and paying for
an indulgence should be discharging the debt before maturity ?   Nor
could he have easily imagined that at such a time Moore was a third
person, acting in his own name, and volunteering to pay so large a
debt from charitable motives, by a " fraternal mandate," extinguishing
the obligation, releasing the mortgage, and trusting for his reward, at
most, to the doubtful security of an action *ex æquo et bono*.   It is not
unfair to remark that this opinion of Kruttschnitt had but a small
foundation.

The notes in question were given for a consideration of the highest
character.   The makers were unable to pay them at maturity and
sought to obtain an extension, at first from the holder, but ultimately
and more advantageously, by an equally common method, a purchase
by some one who had money to invest in such securities and was
therefore not only willing but anxious to give further indulgence.   The
extension was made accordingly.

We must conclude that the plaintiffs, on whom the *onus* rests, C. C.
2429, have not established payment and extinguishment with reason-
able certainty.   16 An. p. 368; 18 An. 245.

It might be urged that if there was no payment for want of consent,
neither was there any purchase and transfer for the same reason.   But
we apprehend that the plaintiffs can not be heard to say this.   The
notes, originally valid and still unpaid, are indorsed in blank and
pass from hand to hand.   Vogel does not claim them, and the plaintiffs
do not contend that the possession and enforcement by McCan deprived
them of any defense they might have had against any previous holder.

The amount of damages allowed was clearly proved.   The defendant
in answering the appeal has asked that they be increased, but we are
not prepared to say that they should be.   The plaintiffs urge that
they ought not to have been allowed at all against the sureties, on the
ground that the act of 1855, providing for a judgment for damages and
fees against the sureties of a plaintiff who enjoins the execution of a

judgment, applies only where the judgment has been enjoined on an allegation of compensation, set-off or payment, since the rendition of the judgment. Acts of 1855, p. 324. A different rule, however, seems to have been settled by repeated decisions ot this court. 13 L. 380; 2 An. 822, 874; 4 An. 188; 10 An. 419; 11 An. 91, 280, 697; 12 An. 181, 587; 14 An. 737; 15 An 52.

Judgment affirmed.

Rehearing refused.

---

LUDELING, C. J., *Dissenting.* I regret the necessity which forces me to dissent from the views of the court in this case. And as the point of difference between us is as to whether or not there was a payment of the notes which are the subject of this litigation, I propose to recapitulate all the evidence on that point.

Mr. John Kruttschnitt, a witness for the plaintiff, having stated that he held the notes in question as the agent of Mr. Vogel, answered as follows:

Question. Were these notes ever paid to you, and if so, when and where?

Answer. I got the money on the eleventh of March.

Q. From whom?

A. I believe from Mr. Moore.

Q. What sort of money was it?

A. It was Confederate money.

Q. That is, Confederate treasury notes, called Confederate money?

A. Yes, sir.

Q. Was there any effort made to pay these notes before; where were they?

A. The notes were deposited in the Citizens' Bank?

Q. Had there been any effort made to pay these notes while in the Citizens' Bank?

A. . I should think so from the fact that the person, I believe Mr. Moore, or some one else, came to me and said he must withdraw the notes from the bank, because the bank could not receive Confederate money without a written authorization.

Q. When the money was paid to you, did you make a sale of the notes to the person who paid the money; did you make a transfer of your rights to him, or did you deliver up the notes as to a person who was paying them?

A. I delivered them as to a person who was paying them.

Q. You never sold the notes at all for Confederate money?

A. Certainly not.

Q. Did you want to receive payment in Confederate money?

A. I took legal advice about receiving Confederate money, and the

opinion was, I could not be forced to receive it, and that if I instituted a suit, I might recover in gold and silver. He said, "that is my advice as a lawyer; now I will give you my advice as a friend," and that advice was to take Confederate money, because at that time it was very dangerous to refuse to take Confederate money. One of my personal friends was very nearly lynched for refusing to receive it.

Q. When was this payment of Confederate money made to you?

A. On the eleventh March, 1862.

Q. Had you been applied to to renew those notes?

A. About a month or so before this I was applied to to renew those notes; there was no rate stipulated, but I told him I would renew the notes at the rates ranging in the market at the date of maturity. I gave my consent to renew the notes, but no rate was agreed upon.

*Cross-examined*—Q. When Mr. Moore called to see you about paying you the money, where were the notes?

A. At the Citizens' Bank for collection.

Q. Were they in a box at the Citizens' Bank?

A. No, sir, they were for collection.

Q. Did not Mr. Moore, after going to the bank, come back and tell you that they could not get the notes, that they were in a box, and did you not send to the bank and get them out?

A. Whether Mr. Moore was at the bank or not, I don't know, but when the gentleman came to my office, requesting me to take the notes out of the bank, because the bank would not receive Confederate money without an authorization to do so, then I sent to the bank and took them out.

Q. Was the money paid you for these notes handed to you personally or deposited at the bank?

A. It was handed to me personally at my office.

Q. What did you do with the money?

A. Deposited it in bank.

Q. Did you carry it personally to the bank and deposit it?

A. No, sir; one of my clerks did.

Q. Then Mr. Moore gave you the money at your office, and you gave Mr. Moore the notes at your office, and one of your clerks took the money and put it in the Citizens' Bank; that is the history of the transaction?

A. Yes, Sir.

Q. You are certain you are not mistaken as to what occurred in that respect?

A. I think not.

Being shown the bank book of Mr. Vogel with the Citizens' Bank, witness states that on the eleventh March, 1862, there appears an entry in the book of a deposit of cash of $28,000.

Q. Did you check out that money?

A. Yes, sir; not this very same day, however

Q. But you checked it out and used it?

A. Yes, sir.

Q. Are you aware of the fact that Mr. Moore was at that time and had been, for some time previously, a broker in the city of New Orleans?

A. I believe I recollect he was a broker, although I believe he was not doing a general broker's business.

Q. Well, you knew him as a broker, didn't you?

A. I believe I did know him as a broker, but perhaps it is only that I know him as a broker now that makes me believe he was a broker then?

Robert Moore sworn and examined for the defendant answered as follows:

Q. Do you know anything about the four notes in controversy?

A. Yes, sir.

Q. What connection had you with these notes at any time, or what was the first connection you had with these notes?

A. Dubois and Mish wanted me to have the notes extended; they could not pay them at maturity.

Q. What did you do in the matter?

A. I went to the holders of the notes several times to find out about the rate at which they would be willing to extend them. I told the agents of Dubois and Mish that it would be eight per cent. for the extension, and they told me to see if I could not do any better.

Q. Which of the agents of Dubois and Mish did you deal with in that matter?

A. John J. C. McLellan.

Q. What subsequent arrangement did you make?

A. I made an arrangement at five per cent

Q. For what length of time?

A. Two years.

Q. In what capacity did you act in that matter?

A. I acted as broker for John McLellan.

Q. Do you know whether McLellan professed at that time to be the representative of Dubois and Mish, and, if so, in what capacity was he their representative?

A. He had a power of attorney to act for them, and before the notes were extended he had to bring his power to the notary.

Q. What did you do afterwards?

A. I went to the holders of the notes and told them I had made better terms for Dubois and Mish, and would take up the notes in a few days before they matured, which I did, and had them extended before W. L. Poole, notary.

Q. Is this document, marked B. C., a copy of the act by which the notes were extended?

A. It is, sir.

Q. Where did the money come from to take up these notes; whose money was it?

A. It was money of William Stone.

Q. Was that the money you gave to Mr. Kruttschnitt?

A. Before the notes were negotiated the trade was made with Stone in the first place, but as he was going to leave he made the arrangement with Major Henry.

Q. But in the matter you acted as broker or intermediary for the parties?

A. Yes, sir.

Q. How was the payment made; how did you get possession of the notes?

A. I went to Mr. Kruttschnitt's office and tendered the money; he told me he wished I would go to the bank and have it deposited, as he was not a very good judge of money; he asked me to go with his young man and then he would know it was all right, if it was put to his credit in the bank.

Q. And did you go and deposit the money to his credit?

A. Yes, sir.

Q. And then he gave you the note?

A. Yes, sir.

Q. And you gave the note to Mr. Stone?

A. I gave the note to the party who made the negotiation in the meantime, to Major Henry.

Q. And this renewal was in pursuance of the original agreement under which you took up these notes?

A. Yes, sir; I had possession of the notes all the time, until they were extended.

Q. Was there any subsequent renewal of these notes?

A. Yes, sir.

Q. What subsequent renewal was there?

A. I bought them before their maturity; they were extended by this act before Poole, and then there was this renewal of the eighteenth March, 1864, for two years.

Q. Where were these renewals made across the face of the notes?

A. They were made at the notary's.

Q. When were they made; at the time they bear date?

A. Yes, sir.

Q. How came Mr. McCan to become possessed of these notes?

A. I sold them to him; he paid me in United States treasury notes.  *  *  *  I paid gold for the notes to Major Henry.  *  *  *

*Cross-examined*—Q. Who is William Stone?

A. He is a person who was with Mr. Tilton at the time.

Q. Where is he now?

A At the North—at least, I believe he is dead; he has been dead four months.

Q. Who is Major Henry?

A. He has a shoe house on Common street.

Q. What is the name of the firm?

A. John Henry & Co.

Q. When did Stone part with the notes?

A. He parted with the notes the very same time, made the profit on the notes at once, because Stone was not a man of any means.

Q. Were you interested in that yourself? Didn't you advance the Confederate money?

A. No, sir, I did not?

Q. So the notes went into the hands of Major Henry the moment you got possession of them?

A. Yes, sir.    *    *    *    *    *    *    *    *

Q. Was not Confederate money exceedingly abundant here in March and April, 1862

A. It was.

Q. Everybody was seeking to get rid of it by way of investment?

A. Yes, sir, and other currency; it was all on a par; we did not believe in currency much.

Q. These Confederate notes, did you have them at the office of Kruttschnitt when you tendered them?

A. Yes, sir.

Q. You say you went to deposit the notes in the bank?

A. He would not take them; he said he wanted them credited to him in the bank and then he knew they were all right.    *    *    *

Q. How comes it that, if these notes were the property of Major Henry, the moment the transaction was closed, we find, on the twenty-first March, 1862, a notarial act by which the extension appears to be made between Stone (who seems to be a man of straw) and McClellan, agent of Dubois & Mish? Why didn't Henry intervene in that act?

A. Stone made his profit on the notes.

Q. That is true, but why was it that on the twenty-first of March, 1862, the extension appears to be in the name of Stone, and not in the name of Henry?

A. It doesn't make any difference about the extension; the transaction was about three weeks in making; Henry wanted an investment and I said to him: "There is an investment about to be completed that you can place your money in."

Q. When you went to Kruttschnitt, did you tell him you came to buy the notes from him ?

A. He knew I went there to have them extended and said the rate was eight per cent. ; I went there twice to see him.

Q. At the instance of McClellan ?

A. Yes, sir.    *    *    *    *    *    *    *

I can not resist the conviction that Moore, the agent of McClellan, the agent of the makers of the notes, first went to Kruttschnitt to make terms about extending the notes, and that, subsequently, he went to him as one authorized to take up the notes for the makers and "tendered payment" thereof; that Kruttschnitt, under a dread of public opinion and of the consequence of outraging it by refusing to receive Confederate money in payment of a debt, received the money tendered as a payment and gave up the notes.

I do not deem it necessary to refer particularly to the contradictions, equivocations and evasions in the testimony of the witness, Moore; they are palpable. But even his testimony shows that the notes were "taken up" by him as the agent of McClellan. He says he went to Kruttschnitt's office to see him about making terms for McClellan for the extension of the terms of payment of the notes ; that Kruttschnitt consented to extend the time ; that he returned, after some delay, to the holder of the notes and told him he had made better terms for Dubois & Mish and would take up the notes in a short time, and shortly afterwards he again went to Kruttschnitt's office and "tendered the money" and received the notes. But if there were any conflict between the testimony of this witness and that of Kruttschnitt, I think the latter witness's testimony entitled to greater weight, for his liability is the same, whether the money were received in extinguishment of the obligation or as the price of a transfer, and his answers are direct, apparently truthful, more consistent with the conduct of rational business men and consequently more probably true.

It is certain Kruttschnitt did not sell the notes or transfer his rights to Moore or any one else; he thought he was delivering up the notes as extinguished by the payment made by Moore. He certainly never dreamed of a sale for Confederate money at a time when that currency was abundant and everybody desired to get rid of it, for it was just before the capture of the city by the Federal forces. It is clear if Moore made the payment for McClellan, the agent of Dubois & Mish, the obligation was extinguished, with all its accessories. C. C. 2130; 5 R. 204; 7 N. S. 602; 11 R. 346; 10 An. 732; 11 An. 708; 13 An. 56.

If he paid it in his own name or in the name of Stone or Henry, is the consequence materially different, so far as the notes are concerned ?

Adele Gernon et als. v. McCan.

Article 2130 of the Civil Code declares that "the obligation may be discharged by a third person no way concerned in it, provided that person act in the name and for the discharge of the debtor, or that, if he acts in his own name, he be not subrogated to the rights of the creditor." There was no subrogation at the time of payment. An agreement to subrogate before payment or an actual subrogation after payment will not suffice. 11 An. 294, Willson v. Gardiner; 15 An. 400, Sewall v. Howard; C. C. 2156, 2157. The case of Holland v. Pierce resembles this case in many respects. That was a case by an indorsee against an indorser of a promissory note. It was drawn by John F. Miller and made payable to the defendant; he indorsed it to the plaintiff, by whom it was transferred to the house of Hyde & Leeds, and by them it was discounted at the office of discount and deposit of the United States Bank.

"The day it became due, at the hour the bank was closing, the plaintiff called and, giving the teller the amount of the note, received it from him. In the evening he handed it over to a notary public, who demanded payment from the maker, which was refused, and the note was accordingly protested. The explanation of this transaction, which the respective parties have made, differs very widely. * * * Which of these statements be true, it concerns not the court to inquire, as the legal rights of the parties must be settled on other considerations. * * * The inquiry by which this question is to be decided needs only be directed to one single fact—was the note *paid* or was it *purchased?* If the latter, the holder had the same right as the person from whom he received it, and could, of course, on default of the maker to pay, have it dishonored. If the former, there could be no protest for non-payment, for the note was already paid. On this head the evidence is very satisfactory. The cashier of the bank tells us that the note here sued on had been discounted by the bank and was their property, that it has never sold it or disposed of any notes that have been discounted there, and that the note could not have been got out of the bank but by payment of it. Another officer of the bank swears it was paid and taken up by the plaintiff about three o'clock of the day on which it fell due.

"It results clearly from this testimony that the appellee did not purchase this note from the bank; that it was not negotiated to him, but delivered to him on his paying the amount. The payment, therefore, inured to the maker, and no matter from what motive it was made, the note could not afterwards be protested, for it was already honored and discharged." 2 N. S. 500.

The judgment based upon notes which had been paid and extinguished should be annulled. Beauchamp v. McMicker, 7 N. S. 607; C. P. 607.