## Moyerman's Case.

Argued April 19, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, DREW and LINN, JJ.

*Charles Edwin Fox.* of *Fox, Rothschild, O'Brien & Frankel,* for appellant.

*Ralph B. Evans,* for appellee.

OPINION BY MR. JUSTICE DREW, June 30, 1933:

Complaint was made by Ferdinand F. C. Meissner to the Committee of Censors of the Law Association of Philadelphia, regarding the professional conduct of the respondent, Samuel Moyerman, a member of the bar. After a hearing, the Committee of Censors presented a petition to the court below, asking that he be disbarred, and a rule was granted upon him to show cause why his name should not be stricken from the roll of attorneys. After a hearing before the court, the rule was made absolute and respondent was disbarred. From that order he has appealed.

The learned judge of the court below succinctly states the case presented against Moyerman in these words: "The charges against the respondent are that while he was acting as attorney for one Meissner he induced the latter to buy worthless stock in a company owned and controlled wholly by himself, without disclosing his interest or informing his client of the true state of the company; and that later he converted to his own use valuable stock, which had been deposited with him by his client in connection with litigation, in which he was

acting as attorney; and that he subsequently, for his own benefit and to the client's loss, induced the client to accept his, Moyerman's, judgment note for the value of the stock. Incidentally to these two charges, it is also said that he permitted himself to secure the charter for the first-mentioned company by false statements under oath; and finally that in his testimony about both the principal subjects he made many false statements under oath, about the business for which he was retained, concerning his connection with the sale of the worthless stock; concerning the financial worth of this company, its stock issue, and his own ownership and control of it."

The record shows that on June 5, 1927, Meissner retained Moyerman as his counsel in a prospective divorce proceeding. He had already consulted three lawyers, and had been told by them that he had no ground for divorce. A detective agency employed by him had reported that his wife was blameless, but referred him to Moyerman. Although three lawyers and a detective firm had found no cause for divorce, Moyerman advised Meissner that he could get him a divorce, and that his fee would be $300. Moyerman inquired of him whether he owned any property, and was informed that he had two properties which were clear of encumbrances. He then advised Meissner that he should mortgage these properties in order to keep his wife from obtaining any interest in them. This was done, and on Moyerman's recommendation and assurance that it was a good company, the proceeds, which amounted to $5,500, were invested in preferred stock of the Gibraltar Realty Company, which had acted as agent in negotiating and placing the mortgages. Meissner did not attend the settlement, and the proceeds of the mortgage loans went directly to the Gibraltar Realty Company, which on August 9, 1927, issued 110 shares of its preferred stock, having a par value of $50 per share, to Meissner, the certificate being signed by Charles J. Young as president and Samuel Greenberg as treasurer.

The Gibraltar Realty Company was a Pennsylvania corporation, incorporated on December 31, 1926. Its purposes were placing mortgages, selling real estate, and making loans under the Small Loans Act. Its authorized capital was $50,000, composed of 500 shares of common stock of $50 par value and 500 shares of preferred stock of $50 par value. The application for the charter was signed by Anna D. Moyerman, Samuel Greenberg, Charles J. Young, and Herbert Goldberg. The last three declared themselves to be subscribers for two shares each of the preferred stock. Mrs. Moyerman, respondent's wife, was declared to be a subscriber to 444 shares of preferred stock and 500 shares of common stock. The application, which was sworn to, further recited that ten per cent of the stock had been paid for in cash by the subscribers. This was not true; the subscribers never paid anything upon their subscriptions, and, in fact, no stock was ever issued to them. In order to deceive the authorities and obtain the charter, Moyerman arranged with a bank that it would credit the company with $5,000, upon the understanding that the company should have no power to draw upon this "deposit," which was to be cancelled as soon as the charter was issued. The statement of the subscribers under oath that they had partially paid for their subscriptions was perjured; Moyerman's conduct in this matter was highly reprehensible, and even in the absence of any other offense would justify his suspension from the practice of law: Rosenbaum's Case, 300 Pa. 465.

Until Meissner bought his stock, no stock had ever been issued by the company. Until that time its only resources consisted of a loan of $3,000 made to it by Moyerman. Subsequently, two shares of common stock were issued to Moyerman "for services in getting the charter." The Gibraltar Realty Company was completely a dummy corporation. It was, in fact, owned, controlled and managed by Moyerman, and he was the company. Its office was in the same suite of rooms as

Moyerman's, and it paid neither rent nor salaries. The president, Young, was a telephone operator working at night, and testified that he was a dummy officer, that he did not attend its meetings, and that he knew nothing of its business. The treasurer, Greenberg, was a clerk in Moyerman's office, and was paid $20 a week by the latter for his services as clerk. All loans were made upon Moyerman's approval. The only money ever invested in the company was the $5,500 paid by Meissner for the preferred stock. The company steadily lost money, and ceased to do business January 1, 1929. On September 30, 1927, out of a total of $6,102 which had been lent, $2,752 had been lent to Moyerman and his brother. A schedule of loans receivable, made after the company had ceased to do business, shows that out of a total of almost $7,000 of loans receivable over $2,500 was owed by Moyerman. Meissner received dividends on his stock until August, 1929, all but three of the payments being made by Moyerman out of his own funds.

Moyerman's story with regard to this matter differed considerably from that of Meissner. He said that the latter did not discuss the project of getting a divorce until some time after his initial call, but came to see about getting a friend out of jail; that Meissner inquired how he could dispose of his real estate without his wife's consent, and was informed that he could not sell it, but could mortgage it; that he did not in any way induce Meissner to buy stock in the Gibraltar company, but that Greenberg did; that Meissner, through friendship with Greenberg, became interested in the concern, inquired about it, and wanted to invest in it. Moyerman did admit, however, that he said the company was all right.

Greenberg flatly contradicted Moyerman. He testified that he had never talked to Meissner with reference to the stock, prior to the time the stock was issued, but that Moyerman told him he was getting someone to invest $5,500 in it.

Several months after this transaction, on January 12, 1928, Moyerman instituted proceedings in divorce on Meissner's behalf. After an answer to the libel had been filed and a rule taken for alimony and counsel fees, Moyerman informed Meissner that a divorce could not be obtained. He advised his client that it would be a better idea to get his wife to sue, and suggested that she might be persuaded to do so by a payment to her of $4,500. Meissner agreed to this, and proposed that the $5,500 which was invested in the Gibraltar Realty Company be used for that purpose. Moyerman replied that he did not want to disturb that investment, so Meissner, on June 23, 1928, turned over to him, to be used for this purpose, 80 shares of Philadelphia Rapid Transit Company seven per cent preferred stock, worth $4,000, and a check for $500, receiving a receipt. This arrangement was made upon the understanding that if the divorce were not granted, or if it were impossible to effect the settlement, the stock and $500 cash would be returned. Meissner endorsed the stock in blank so that Moyerman could sell it if the settlement were arranged. At this time, according to Moyerman's own testimony, no arrangement had been reached with the lawyer for Meissner's wife with regard to a money payment. There was, therefore, no need of Moyerman's getting funds for this purpose from Meissner. Nevertheless, he immediately cashed the $500 check, and, two or three weeks later, had the stock transferred to his own name. Later he received a dividend check on the stock, which he endorsed over to Meissner. In November, 1928, Moyerman advised his client that the project of a money settlement had fallen through. Instead of returning the Philadelphia Rapid Transit Company stock, Moyerman, on November 22, 1928, gave his own judgment note for $4,350, representing $4,000 for the stock and $500 for the check, less $100 to cover the master's fee and a $50 fee for Moyerman's services. He requested Meissner not to record the note, as it would affect his financial standing.

Moyerman, however, testified that he offered to return the stock but that Meissner said he would rather have the money invested at interest, and told him to go ahead and invest the money, but "give me the same as I would have if I had P. R. T. stock." Moyerman testified that at that time he considered his own credit as good as that of the Philadelphia Rapid Transit Company, and so, in place of the seven per cent stock, Meissner received a six per cent judgment note. On this note Moyerman has made payments, apparently totaling $1,590, the last payment having been made in the latter part of 1929. The result of this transaction was that Meissner exchanged the preferred stock of a large company, then selling above par on the market, for Moyerman's personal credit. That this was an improper transaction needs no proof. Even if he really thought his own credit as good as that of the Philadelphia Rapid Transit Company, a sense of common decency and fairness would have required Moyerman carefully to explain the exact character of the transaction to his client. On November 28th, Moyerman sold the stock.

As a result of his dealings with Moyerman, Meissner has paid $5,500 for worthless stock, Moyerman has received stock worth $4,000 and $500 in cash, for which Meissner holds a judgment note of dubious value. In addition, Meissner has paid Moyerman, instead of the $300 fee suggested at the outset of their relation, the sum of $530 in legal fees, not including the $150 which was deducted in calculating the judgment note, and $250 paid the Gibraltar Realty Company as commissions for negotiating and placing mortgages upon his property. Against the sums received by Moyerman and his company, totaling $10,780, Meissner has received in return less than $1,600 on his judgment note and, apparently, $660 as dividends upon the stock of the Gibraltar Realty Company. In other words, as a result of his dealings with Moyerman, Meissner is out $8,530.

On this evidence, the learned court below found that Meissner at the very beginning consulted Moyerman about a divorce, and that the latter made false statements under oath about the business for which he was retained; that Moyerman induced Meissner, his client, to invest $5,500 in the worthless stock of a company managed and controlled by himself, without making any disclosure of these facts and upon his representation that it was a good company; that he falsely testified under oath that Greenberg induced Meissner to buy the stock of the Gibraltar Realty Company; that he caused his wife and the other incorporators of the Gibraltar Realty Company falsely to certify under oath that ten per cent of the capital stock of the Gibraltar Realty Company had been paid for in cash; that he obtained $4,000 worth of stock from Meissner, for the alleged purpose of raising money for the purposes of the litigation in which he was acting as attorney, and that instead of so using it he conveyed it to himself; and that before the negotiations in which this stock was to be used were abandoned, he induced Meissner to accept his own judgment note for this stock. The evidence amply supports these findings. The court below could not have concluded otherwise. Although in disbarment cases it is our duty to review the same de novo (Act of May 19, 1879, P. L. 66), in no class of cases are the findings of the trial court, based upon the evidence, of more persuasive influence upon an appellate court than in a case such as this, involving the integrity of a member of the bar. Where—as in this case—there is sufficient evidence to warrant its conclusions, we will be slow to interfere: Smith's App., 179 Pa. 14; Wilhelm's Case, 269 Pa. 416; Dixon v. Minogue, 280 Pa. 128; Gery's Case, 284 Pa. 121. An examination of Moyerman's testimony shows that he was shifty, evasive, and untruthful. His story, contradicted, as it is, by the admitted facts and by the testimony of the other witnesses, is unworthy of belief. His own admissions are enough to condemn him.

These facts demonstrate that Moyerman is not a fit person to be a member of the bar. Not only does he lack the ethical perception which is essential in an attorney, but he is deficient in that sense of fairness and just dealing which every person should have, whatever his walk in life. He does not appreciate the sanctity of an oath, or the obligation of obeying and not evading the law; he sees nothing objectionable in advising his client to invest in a worthless company controlled by himself; he does not realize that in his dealings with his client his conduct must be characterized by the utmost fairness. He seems to admit that his conduct was improper in the relation of lawyer and client, but attempts to defend it on the ground that the relation which existed was only that of debtor and creditor; there is not the slightest basis for this contention in the record. As the court below said, "There is only one discipline for such a man, for the protection of other possible clients, and that is to put it out of his power to misuse his position as a member of the bar, by disbarring him from further practice."

The argument of the learned and able counsel who presented Moyerman's cause before us is little more than a plea for mercy. He has printed in his brief a letter which Moyerman wrote him after the order of the court below was entered. In it, Moyerman stated his realization of the fact that he had been "careless," and pledged himself to a future professional life of service, integrity, and usefulness, if privileged to continue the practice of law. Under these circumstances, his counsel argues, disbarment is too heavy a punishment. The sentence imposed by the court below is, as he aptly says, a sentence of professional death. But the object to be attained by disbarment is not punishment, but protection to the public (Barach's Case, 279 Pa. 89; Wolfe's Disbarment, 288 Pa. 331; Ex parte Wall, 107 U. S. 265); as punishment, it would be unreasonably severe: see Austin's Case, 5 Rawle 191. The drastic consequences to the person disbarred are but an unavoidable incident

of the disbarment. Moyerman's regret cannot supply his lack of the essential qualifications of a member of the bar.

The law is an ancient and honorable profession. Throughout its whole existence it has been maintained in the confidence of the people by the integrity of its members. The practice of the law requires an almost sacred confidential relationship between lawyer and client, and it must at once be perceived that whatever is necessary to maintain that confidence must be done, no matter the cost. The practicing members of the profession are the arms of the court, which exists only for the administration of justice, and as officers of the court they are held out to the community as worthy of special trust and confidence. The court itself would fail of its duty to the public if it did not, when an attorney has proved himself unworthy, withdraw its endorsement and strike his name from the rolls: Davies' Case, 93 Pa. 116. We conclude, therefore, as did the court below, that respondent must be disbarred.

The order appealed from is affirmed; costs to be paid by appellant.