348 A.2d 376

**In re Disbarment Proceedings of Joseph P. McLAUGHLIN**

v.

**PHILADELPHIA NEWSPAPERS, INC., Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 19, 1974, J–464.

Decided Nov. 26, 1975.

Harold E. Kohn, David H. Marion, Arthur B. Maka-don, Philadelphia, for appellant.

John Rogers Carroll, Carroll & Gabriel, for appellee.

Harold Cramer, Philadelphia, amicus curiae.

Before JONES, C. J., and EAGEN, O'BRIEN, ROB-ERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION OF THE COURT

POMEROY, Justice.

Appellant, Philadelphia Newspapers, Inc., is the owner and publisher of *The Philadelphia Inquirer*, a major daily newspaper of general circulation in the city of Philadelphia. (appellant will sometimes hereinafter be referred to as "the Inquirer"). In early 1974, members of the *Inquirer* reporting staff began an investigation into the background of Joseph P. McLaughlin, a newly appointed assistant district attorney of Philadelphia County, who was sworn into office on January 8, 1974. The purpose of this inquiry was to gather information which the reporters believed would be useful in assessing Mr. McLaughlin's qualifications for his recently obtained position.

During the course of its investigation, the *Inquirer* learned that, while engaged in the private practice of law, McLaughlin had been the subject of disciplinary proceedings before the court of common pleas of Philadelphia County. In accordance with long-standing local practice in that court, the proceedings were conducted privately and the record of the hearing was impounded in order to preserve confidentiality. Thus, there is no public record of the nature of the charges brought against Mr. McLaughlin or of their ultimate disposition. All that is known from the record before us is that criminal misconduct was not at issue and that the disciplinary court was satisfied that public discipline was not warranted. Believing that the record would, nevertheless, be relevant to the object of its investigation, the *Inquirer* sought access to it by petitioning the court to vacate the impoundment order and to permit the *Inquirer* personnel to inspect and photocopy the record. After

hearing argument, the court of common pleas dismissed the petition. This appeal ensued.[1]

Appellant contends that McLaughlin, by accepting a position of public trust, has become a public figure; that the public has a right to be informed as to his fitness to fulfill the obligations of his office; that it is the function and responsibility of the press, as here represented by the *Inquirer*, to effectuate this end by ferreting out pertinent information; and that it is constitutionally impermissible to deny the press access to records bearing directly on a public official's fitness to hold the office he has assumed. In short, the *Inquirer* claims that the "freedom of the press" clause of the First Amendment of the Constitution of the United States, applicable to the states through the Fourteenth Amendment, see *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L. Ed. 1031 (1942), guarantees *access* to records of a disciplinary proceeding against a public official, notwithstanding that the record was impounded pursuant to a long-standing local procedure in order to assure confidentiality, and notwithstanding that this was done at a time when the official was a private citizen and did not occupy a position of public trust. We do not agree, and will affirm.

An analysis of appellant's contention requires an inquiry into both the scope of the *Inquirer's* First Amendment right, and the nature of the disciplinary proceedings the confidentiality of which appellee seeks to maintain. To these considerations we now turn.

## I.

Perhaps at no time in the history of this nation have the American people been more acutely sensitive to the issue of the legitimacy of governmental secrecy; and it is

1. Jurisdiction of the appeal is in this Court pursuant to The Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(4), 17 P.S. § 211.202(4) (Supp.1975–76).

with increased scepticism that the public responds to the justifications offered by government for its refusal to divulge particular information possessed by it alone.[2] In events still fresh in public memory we as a society have recently borne witness to the vital democratic safeguards which inhere in a free and unbridled press. In exposing the abuses that some would have shielded behind a cloak of officially sanctioned secrecy, the press has rekindled our appreciation of its constitutionally designed function:

"Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve. Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change, . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free."

*Mills v. Alabama*, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484, 488 (1966).

It is, then, with great caution that we must proceed in weighing an allegation that the state is impermissibly impairing this fundamental function. Yet we must do so with the knowledge that the Constitution has not granted unrestricted power to the press to pursue its purpose, and that the press has been denied access to information, notwithstanding contentions that its function would be impermissibly impaired. See *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *McMullan v. Wohlgemuth*, 453 Pa. 147, 308

2. See S. Ervin, Jr., *Controlling Executive Privilege*, 20 Loyola L. Rev. 1 (1974). See also Cohen, *The Public's Right of Access to Government Information Under the First Amendment*, 51 Chi.-Kent L.Rev. 164 (1974–75); Comment, *The First Amendment and the Public Right to Information*, 35 U.Pitt.L.Rev. 93 (1973).

A.2d 888 (1973); Cf. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

At the outset it should be noted that this is not a case which calls into question the right of the press to print, publish and distribute information which it has already acquired. As such it stands on a different constitutional footing than decisions which have shielded the press from the chilling effect of potential defamation judgments, *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L. Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975 (1967); *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964); and freed the press from the shackles of prior restraint, *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). In those cases the freedom of the press clause was held to afford broad protection against governmental interference with the publication of information in the possession of the press; they in no way decided or explored the related but distinct question of the right of the press to *gather* news. Accordingly, they are of little assistance in resolving the issues now before this Court, for what appellant is asserting is not a right to publish information in its possession, but a constitutional right to acquire information not now in hand.[3]

The perimeters of the right of the press to gather information remain largely uncharted. A right of access founded solely on the freedom of the press clause was

3. Appellant makes no claim, nor could one be successfully asserted, that the Pennsylvania "Right-to-Know Act", Act of June 21, 1957, P.L. 390, 65 P.S. § 66.1 *et seq.*, mandates disclosure of the desired records. By its terms the Act does not encompass "any record . . . access to or the publication of which is prohibited, restricted or forbidden by . . . order or decree of court." As the impoundment in question was by court order, the Act would be of no avail to appellant. Its contention, therefore, is squarely founded on an asserted "freedom of press" right of access to the information.

first asserted in *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L.Ed.2d 626 (1972). There the United States Supreme Court held that the freedom of the press clause does not accord a newsman a privilege against testifying before a grand jury as to the identity of his sources or as to information received in confidence, where the request is made in good faith and the information sought is relevant to the inquiry. Although the justices of the Court disagreed as to the scope of the newsman's privilege, all members of the Court did recognize that the press, of necessity, has a limited constitutional right to gather news: [4]

> "Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." Id. at 681, 92 S.Ct. at 2656, 33 L.Ed.2d at 639. (opinion of the Court, per White, J.).

This recognition was echoed broadly in the dissenting opinion of Mr. Justice STEWART, in which Mr. Justice BRENNAN and Mr. Justice MARSHALL joined:

> "No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions, must exist." Id.

---

**4.** The Court was, however, clear in pointing out that the right is of limited scope.

"Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal."

*Branzburg v. Hayes*, 408 U.S. 665 at 684–85, 92 S.Ct. 2646 at 2658, 33 L.Ed.2d 626 at 641 (1972) (opinion of the Court, per White, J.).

at 728, 92 S.Ct. at 2673, 33 L.Ed.2d at 667 (Stewart, J., dissenting).

■ The "dimensions" of this right were recently given some definition by the Supreme Court in *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). In *Pell*, members of the communications media challenged an administrative regulation promulgated by the Director of the California Department of Corrections which prohibited " '[p]ress and other media interviews with specific individual inmates' " of California prisons. Id. at 819, 94 S.Ct. at 2802, 41 L.Ed.2d at 500. It was asserted that the regulation infringed the freedom of the press guaranteed by the First and Fourteenth Amendments in that it denied the press access to sources of newsworthy information, viz., prison inmates who desired interviews with the press. In rejecting this claim, the Court first pointed out that, by virtue of a similar regulation, members of the general public were equally denied interviews with specifically named inmates, and that this regulation was a reasonable exercise of administrative discretion. Mr. Justice STEWART, writing for the Court, then went on to hold that the press has no greater right of access than that afforded to the general public—there is no independent "freedom of the press" right of access: [5]

"It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources, cf. *Branzburg v. Hayes*, . . . and that the government cannot restrain the publication of news emanating from such sources. Cf. *N. Y. Times v. United States* . . . It is quite another thing to suggest that the Constitution imposes upon government the af-

5. See Nimmer, *Introduction—Is Freedom of the Press a Redundancy: What Does it Add to Freedom of Speech?*, 26 Hastings L.J. 639, 642 (1974).

firmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court." 417 U.S. at 834–35, 94 S.Ct. at 2810, 41 L. Ed.2d at 508–09.

Thus, the Court seems clearly to have equated the press' right of access with the right of access of the public. See also *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). It has been aptly observed, however, that this formulation "seems to have defined one unknown in terms of another", for the public's right of access was and remains a constitutionally undefined concept. Note, *The Rights of the Press and the Public to Gather Information*, 87 Harv.L.Rev. 1505, 1507 (1974). Any circumscription of this right would be a delicate, sensitive process. The facts of this case do not require us to pursue so perilous an undertaking.

## II.

This Court has long recognized that "the court before whom the attorney practices has the undoubted power to formulate such rules as it sees fit to discipline, disbar, or admit persons to practice," *Hanson's Appeal*, 330 Pa. 390, 391, 198 A. 113, 114 (1938), subject, of course, to the safeguards of procedural due process of law. *In re Shigon*, 462 Pa. 1, 329 A.2d 235, 241 (1974).[6] In discussing the regularity of disciplinary

---

**6.** The local rule which governed the proceeding in question substantially comports with Rule 17–23 of the Rules of the Supreme Court of Pennsylvania, adopted March 21, 1972, effective July 1, 1972, 446 Pa. xxiii (1972), later extended to Nov. 1, 1972. The McLaughlin disciplinary proceeding took place prior to the adoption of this rule; therefore, the rule does not govern by its own force.

See *Montgomery County Bar Ass'n v. Hecht*, 456 Pa. 13, 317 A.2d 597 (1974). Because, however, Rule 17–23 substantially codified the local procedure as it existed in Philadelphia County, its language will be referred to for the purpose of analysis.

proceedings held by the court of common pleas of Philadelphia County to hear allegations of misconduct by certain members of the Philadelphia bar, Chief Justice KEPHART well summarized the powers of the court:

"It is the right and duty of a court to discipline its members who appear before it guilty of wrongdoing. *In re Davies,* 93 Pa. 116; *In re Wolfe's Disbarment,* 288 Pa. 331, 135 A. 732, 50 A.L.R. 380. Courts have an inherent power to make and follow rules governing such matters or to formulate new rules as the case demands so long as no right of the member charged is invaded. But the rules thus established do not restrict the general power of the courts; the power which establishes such rules in the first instance also enables the courts to disregard such rules and adopt the methods most suitable to the occasion." In re: *Disbarment Proceedings,* 321 Pa. 81, 101, 184 A. 59, 68 (1936).

See also *Office of the Disciplinary Counsel v. Campbell,* 464 Pa. ——, 345 A.2d 616 (1975); *In re Shigon, supra; Montgomery County Bar Ass'n. v. Hecht,* 456 Pa. 13, 317 A.2d 597 (1974) ; *Montgomery County Bar Ass'n. v. Rinalducci,* 329 Pa. 296, 299, 197 A. 924 (1938). See generally ABA Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement, 10–18 (1970) [hereinafter cited as "Clark Report"].[7]

The impoundment practice followed in the McLaughlin proceeding fully comports with present Rule 17–23 [8] which provides, in relevant part:

"All proceedings involving allegations of misconduct by . . . an attorney shall be kept confidential until and unless the Supreme Court enters its order

---

**7.** The report has been so called because the chairman of the Special Committee was the Honorable Tom C. Clark, former Justice of the United States Supreme Court.

**8.** See note 6 *supra.*

for the imposition of public discipline or the respondent-attorney requests that the matter be public or the investigation is predicated upon a conviction of the respondent-attorney for a crime . . ."

This rule, declaratory of prior practice in Pennsylvania, reflects the considered judgment that there is nothing to be gained and much to be lost, where an attorney's reputation and livelihood are concerned, by opening to the public the record of proceedings concerning allegations of professional misconduct which are ultimately found to be groundless.[9]    Additionally, even where the charges brought against a lawyer have merit, it is often the case that the misconduct demands discipline of no greater magnitude than private reprimand.[10]    As a primary objective of such a minor penalty is the rehabilitation of the lawyer (in addition, of course, to the protection of the public interest), confidentiality may be considered essential to ensure that rehabilitative efforts are not

---

**9.** See, e. g., Clark Report at 139:

> Disclosure of the existence of that accusation may itself result in irreparable harm to the attorney.  His practice may be diminished, if not substantially destroyed, by the resulting lack of confidence of old and new clients, judges before whom he has to appear and fellow attorneys with whom he must negotiate.
>
> *    *    *    *    *    *    *    *    *    *
>
> [T]he attorney never can recoup the financial loss caused by public disclosure of charges against him, even if he is subsequently exonerated.  In fact, since later exoneration is never as newsworthy as the prior accusation, it is likely that the damage visited on him will continue even after the charges have been found not to have been sustained.

**10.** Rule 17–4 of the Rules of Disciplinary Enforcement sets forth the types of Discipline that may be imposed against an attorney. Rule 17–4 provides:

> "Misconduct shall be grounds for:
> (a) Disbarment by the Supreme Court; or
> (b) Suspension by the Supreme Court for a period not exceeding five years; or
> (c) Public censure by the Supreme Court; or
> (d) Private reprimand by The Disciplinary Board of the Supreme Court of Pennsylvania; or
> (e) Private informal admonition by Disciplinary Counsel."

thwarted by disclosures which may be prejudicial.[11] Thus, when McLaughlin as a private practitioner appeared before the court of common pleas to answer allegations of a non-criminal nature concerning his private practice, he did so with the expectation, fully warranted, that unless public discipline were imposed, i. e. public censure, suspension or disbarment, the proceedings would remain confidential.

## III.

Appellant does not challenge the basic power which, prior to the adoption by this Court of the present Rules of Disciplinary Enforcement, the court of common pleas possessed to formulate appropriate rules governing disciplinary proceedings, or to impound the records of such proceedings brought against private practitioners. Rather, it is contended that when the private practitioner becomes a public official the state's interest in maintaining confidentiality through continued impoundment of the record must yield to the protections embodied in the freedom of the press clause of the First Amendment. In essence, appellant draws upon the "public official" concept which the Supreme Court has applied in order to protect the unfettered freedom of the press to report and comment on such a personage without having to serve as guarantor of the truth of its published statements. See *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The *Inquirer* would have us hold that this concept similarly should serve as the touchstone by which the amorphous public right of access to information can be given meaning. It is not at all clear,

11. These arguments are pressed by the court of common pleas of Philadelphia County, which has submitted a brief to this Court as *amicus curiae*. *Amicus* strongly urges that its practice of maintaining the confidentiality of disciplinary proceedings which involve allegations of professional misconduct of a noncriminal nature serves the state's legitimate interest in preserving the integrity of the court and bar, as well as protecting the privacy of lawyers and facilitating their rehabilitation.

however, that the "public official" classification, so necessary to protect the press in its publication of critical information already in its possession, should be extended so as to grant the press a constitutional power to acquire such information. As Mr. Justice STEWART, author of the majority opinions in both *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 280, 41 L.Ed.2d 495 (1974) and *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L. Ed.2d 514 (1974), has written in a non-judicial context:

"So far as the Constitution goes, the autonomous press may publish what it knows, and may seek to learn what it can. But this autonomy cuts both ways. The press is free to do battle against secrecy and deception in government. But the press cannot expect from the Constitution any guarantee that it will succeed. There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." Stewart, *"Or of the Press"*, 26 Hastings L.J. 631, 636 (1974) [Footnote omitted].

We need not here decide, however, whether as a general proposition the public official concept may be properly used as an aid in defining the public's First Amendment right of access. Indeed, we need not here intimate any view as to whether such a right of access exists in this case, for even assuming a right of access to impounded court documents pertaining to a public official, we would conclude that the right is overborne by the paramount interest of the state in protecting the grant of confidentiality which prevailed in the circumstances here present. Because this interest of the state arose at a time McLaughlin was a private citizen, we have con-

cluded that the interest is not affected by his lately acquired status as a public official.

This Court has held that the right of the press to gather news is not absolute, and that it must yield to a showing of a paramount state interest. *McMullan v. Wohlgemuth,* 453 Pa. 147, 308 A.2d 888 (1973).[12] In *McMullan,* we declined to hold that the press had a constitutional right of access to the names of persons receiving public assistance. The ground of our decision was that the state's interest in preserving the family life and self-respect of the recipients outweighed any "non-absolute right of the press to 'gather news'." Id. at 165, 308 A.2d at 897. In the present case there is an equally weighty state interest, namely, that of "preventing public disclosures that would endanger . . . the interests of those from whom [the state] has obtained information on a confidential basis." Note, *The Right of the Public and the Press to Gather News,* 87 Harv.L.Rev. 1505, 1526 (1974). Assurance of confidentiality is a major inducement by which the government elicits cooperation with legitimate state processes. To the extent that such assurances are not carried out, not only is the integrity of the government compromised, but the cooperation sought to be secured is threatened.

Here, the information received by the court in the McLaughlin disciplinary hearing, as in any such case, was given by the complainant, McLaughlin, and perhaps

12. The author of this opinion, joined by Mr. Chief Justice JONES, dissented in *McMullan,* but the dissent was directed to the problems of construction of the two statutes there involved, viz., Pennsylvania's "Right to Know Act," 65 P.S. § 66.1 *et seq.* and the Public Welfare Code of 1967, 62 P.S. § 401 *et seq.* Given the majority view that the Right to Know Act, properly interpreted, did not extend to divulgence of the welfare records there sought, the dissenting opinion expressed agreement with that part of the opinion of the Court which held that the newspaper was not entitled as a matter of federal or state constitutional law to compel the production of the information which had been refused to it. See *McMullan v. Wohlgemuth,* 453 Pa. 147, at 181, 308 A. 2d 888, at 905 (dissenting opinion of Pomeroy, J.).

other witnesses with the expectation of all concerned that unless public discipline were imposed the proceedings would remain confidential. Had McLaughlin remained a private practitioner, the state's interest in protecting that expectation would seem undeniable. To hold that McLaughlin's present position renders the state's interest in protecting the same expectation any less worthy of protection would undercut the vital function that rules of confidentiality serve in assisting legitimate governmental processes to carry out their designated functions. Few would volunteer information if the confidentiality upon which they relied remained protected only until such time as the information became too newsworthy, or the subject of the information too important. Thus, to repeat, even assuming a right of the press to obtain the investigatory information it seeks by the present petition, such right would be overborne by the compelling interest of the state to protect expectations of confidentiality such as those justifiably held by McLaughlin in this case.

It is important to note that the information here sought does not relate to governmental operations, nor did the court below suppress the statements of an otherwise voluntary source. Hence, the suppression sought to be upheld in this case seems to stand on an even stronger footing than that sanctioned in *Pell*, where the Court permitted denial of access to a voluntary source (inmates of a state prison) for the purpose of assessing the effectiveness of a governmental operation (the prison system of a state). See Note, *The Right of the Public and Press to Gather Information*, 87 Harv.L.Rev. 1505, 1524–25 (1974). Furthermore, we are not here dealing with an arbitrary suppression of information by the government, acting through the courts, relating to its own operation. The order to impound the record was made pursuant to a longstanding procedure and only after McLaughlin had been exonerated or found guilty of a violation deemed

not sufficiently serious to warrant public censure, suspension, or disbarment. In either event the procedure for enforcing confidentiality may be deemed essential and within the administrative competence of a disciplinary board or court to determine. Compare *Pell v. Procunier, supra*, 417 U.S. at 830, 94 S.Ct. 2800, 41 L.Ed. at 506–07.

In sum, we hold that the freedom of the press is not violated by denying the *Inquirer* access to court records of a disciplinary proceeding brought against a private lawyer, now in public office, concerning matters which were non-criminal and non-governmental in nature, where such proceeding was conducted with the expectation that it would remain confidential and an impoundment order was duly entered in accordance with standard practice, and where the lawyer involved desires that the confidentiality be maintained.

Order affirmed. No assessment of costs.

MANDERINO, J., concurs in the result.

ROBERTS, J., filed a dissenting opinion.

ROBERTS, Justice (dissenting).

I dissent from the majority's holding that the disciplinary court could refuse to vacate its own impoundment order. The infringement of appellant's first amendment right to gather information is not justified because: (1) there are less restrictive means of protecting the asserted governmental interests given recognition by the majority; and (2) even if no less restrictive alternatives exist, there is no compelling state interest to justify this governmental secrecy. The majority affirms the concealment of the record of a court proceeding despite the clear public policy to the contrary. It does so without

having the record available.[1]   I would reverse the court's refusal to vacate the impoundment order.

## I

The first amendment right to gather news is clearly established in Pennsylvania. *McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888 (1973), app. dism., 415 U.S. 970, 94 S.Ct. 1547, 39 L.Ed.2d 863 (1974).[2]   The importance of this right can be fully appreciated by relating it to the very foundation of the first amendment.   Justice Brandeis observed:

"[Those who won our independence know]   .   .   . that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones.   Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form.   Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

*Whitney v. People of California*, 274 U.S. 357, 375, 47 S. Ct. 641, 648, 71 L.Ed. 1095 (1927) (dissenting opinion);

1.   The impounded record is so sealed in secrecy that the majority decides this case without knowing the date of the disciplinary proceeding, the findings of the disciplinary court, the attending circumstances of the alleged misconduct, or the reasons for the resulting impoundment order.   In fact, this totally silent record does not reveal whether the court which refused to vacate the impoundment order had any of this essential information before it.

2.   "[W]e agree that [the right to gather news], emanating from the First Amendment, does exist, [but] this right, as all other First Amendment rights, is not absolute."
*McMullan v. Wohlgemuth*, 453 Pa. 147, 163, 308 A.2d 888, 896 (1973), app. dism. 415 U.S. 970, 94 S.Ct. 1547, 39 L.Ed.2d 863 (1974); see *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656–57, 33 L.Ed.2d 626 (1972).

see *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720–21, 11 L.Ed.2d 686 (1964).

Silence imposed by refusing to inform is indistinguishable in effect from silence imposed by curtailing the speech of those already informed.[3] The evils are identical in either case: the curtailment of public debate and discussion of "supposed grievances and proposed remedies"; the dampening of "thought, hope and imagination"; the loss of the paramount public interest in a free flow of information to the people;[4] the imposition of secrecy over governmental decision processes; and, ultimately, the denial of a citizen's right to meaningful self-government. The first amendment serves ". . . to promote honesty of government by seeing to it that public business functions under the hard light of full public scrutiny." *Tennessean Newspapers, Inc. v. Federal Housing Administration*, 464 F.2d 657, 660 (6th Cir. 1972). Recent national events fully illustrate both the dangers of government by secrecy and the absolute necessity of an informed public.[5]

**3.** See Note, The Right of the Press to Gather Information, 71 Colum.L.Rev. 838, 843–46 (1971); Note, The Right to the Public and the Press to Gather Information, 87 Harv.L.Rev. 1505, 1505–07 (1974); Comment, The First Amendment and the Public Right to Information, 35 U.Pitt.L.Rev. 93, 93–94 (1973).

**4.** See *Pell v. Procunier*, 417 U.S. 817, 832, 94 S.Ct. 2800, 2809, 41 L.Ed.2d 495 (1974); *Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S. Ct. 209, 217, 13 L.Ed.2d 125 (1964).

**5.** Statutory rights to access to governmental information have been created at both the federal and state level. See Freedom of Information Act, 5 U.S.C., § 552 (1972); Right to Know Act, Act of June 21, 1957, P.L. 390, § 1 et seq., 65 P.S. § 66.1 et seq. (1959). The Committee Report, commenting on the federal statute, observes:
"A democratic society requires an informed, intelligent electorate, and the intelligence of the electorate varies as the quantity and quality of its information varies. A danger signal in the United States is the fact that such a political truism needs repeating."
H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1966).
Because of the dangers of governmental secrecy, the government has the burden of showing the necessity of nondisclosure under the Freedom of Information Act, and exemptions are con-

Only a free press can effectuate this first amendment "right to know" held by the public. Public debate and discussion is meaningless without an effective vehicle to convey information concerning governmental decisions.[6] Although the press may not have any "special access" to information not available to the public,[7] curtailing the press' right to gather what should be public information is a direct infringement of the public's right to know and its capacity to participate in governmental affairs.

Thus, the press' right to gather information must be given first amendment protection. As with other first amendment rights, this protection is not absolute. *Branzburg v. Hayes*, 408 U.S. 665, 682–86, 92 S.Ct. 2646, 2657–59, 33 L.Ed.2d 626 (1972); *McMullan v. Wohlgemuth*, supra, 453 Pa. at 163, 308 A.2d at 896. The right to gather news may be affected by virtually any governmental action and may give rise to "speculative" or uncertain first amendment claims. *Branzburg v. Hayes*, supra, 408 U.S. at 690, 693–94, 92 S.Ct. at 2661, 2663;

strued narrowly in favor of disclosure. *Montrose Chem. Corp. v. Train*, 160 U.S.App.D.C. 270, 491 F.2d 63, 66 (1974); *Cuneo v. Schlesinger*, 157 U.S.App.D.C. 368, 484 F.2d 1086, 1091 n. 15 (1973) and cases cited therein.

These statutory provisions have explicit exemptions for court proceedings. See 5 U.S.C. § 551(1)(B) (1972); Act of June 21, 1957, P.L. 390, § 1, 65 P.S. § 66.1 (1959). However, they clearly illustrate a legislative policy in favor of public disclosure of governmental business which is derived directly from the first amendment. See *Tennessean Newspapers, Inc. v. Federal Housing Administration*, 464 F.2d 657, 660 (6th Cir. 1972); *Nixon v. Sampson*, 389 F.Supp. 107, 121 (D.C.D.C.1975). We should follow the same principles in determining the procedures to be followed for disclosure of judicial proceedings.

**6.** See *Mills v. Alabama*, 384 U.S. 214, 219, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 602–03, 73 S.Ct. 872, 877, 97 L.Ed. 1277 (1953); Note, Colum.L.Rev., supra note 3, at 839–43.

**7.** See *Pell v. Procunier*, 417 U.S. 817, 833, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974); *Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S. Ct. 2646, 2658, 33 L.Ed.2d 626 (1972); *Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280–81, 14 L.Ed.2d 179 (1965); *McMullan v. Wohlgemuth*, 453 Pa. 147, 163, 308 A.2d 888, 896 (1973), app. dism., 415 U.S. 970, 94 S.Ct. 1547, 39 L.Ed.2d 863 (1974).

*Zemel v. Rusk*, 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280–81, 14 L.Ed.2d 179 (1965). Here, however, the government is imposing a direct restriction on the right to gather news by impounding court records. Such secrecy can only be justified by showing a "compelling" or "paramount" state interest in maintaining the restriction. See *Branzburg v. Hayes*, supra, 408 U.S. at 700, 92 S.Ct. at 2666; *McMullan v. Wohlgemuth*, supra, 453 Pa. at 163, 308 A.2d at 896; *DeGregory v. Attorney General*, 383 U.S. 825, 829, 86 S.Ct. 1148, 1151, 16 L.Ed.2d 292 (1966); *NAACP v. Button*, 371 U.S. 415, 439, 83 S.Ct. 328, 341 (1963).[8]

Even if the court imposing secrecy can show such a compelling interest, our review must extend further. We must scrutinize the impoundment order to ensure that no less restrictive alternative is available. See *Branzburg v. Hayes*, supra, 408 U.S. at 680–81, 92 S.Ct. at 2656; *Police Dep't v. Mosley*, 408 U.S. 92, 101 n. 8, 92 S.Ct. 2286, 2293 n. 8, 33 L.Ed.2d 212 (1972); *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274; *NAACP v. Button*, supra, 371 U.S. at 438, 83 S.Ct. at 340; *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).[9]

**8.** See also Note, Colum.L.Rev., supra note 3 at 843; Note, Access to Official Information: A Neglected Constitutional Right, 27 Ind.L.J. 209 (1952); Comment, U.Pitt.L.Rev., supra note 3, at 93–4.

One writer questions the existence of a right of access because he doubts that it could be effectively enforced by the courts. However, he focuses his discussion on a court's ability to police the disclosing practices of the executive and legislative branches of government. Clearly this Court has the power and duty to supervise judicial disclosure procedures. See Note, Harv.L.Rev., supra note 3, at 1510–14.

**9.** In *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960), the Court stated:

"[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." (footnotes omitted.)

This scrutiny must also be applied when the state asserts a compelling interest in protecting the rights of others, such as a defendant's right to a fair trial or a citizen's right to privacy, to justify restrictions on first amendment rights. We must ensure that the competing interests are fairly balanced and that no unnecessary burdens on first amendment rights are imposed. See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); *McMullan v. Wohlgemuth*, supra.

The majority describes the first amendment right to gather information as "amorphous" and appears to assert that it is not worthy of full first amendment protection. Yet the very cases cited by the majority are to the contrary.

In *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L. Ed.2d 495 (1974), the Court held that the press did not have a right of unlimited access to interview prison inmates because of the serious disciplinary problems such a policy had created in the past. The Court was careful to note that:

". . . this regulation is not part of an attempt by the State to conceal the conditions in its prisons or to frustrate the press' investigation and reporting of those conditions."

Id. at 830, 94 S.Ct. at 2808. On the contrary, the press was given regular tours of the entire system, allowed random interviews, permitted to investigate any particular prison program, and given an opportunity to sit in on group meetings and to interview inmate participants. The Court stated that these policies reflected ". . .

This fundamental principle certainly applies to the impoundment of court records. See also, Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

a recognition that the conditions in this Nation's prisons are a matter that is both newsworthy and of great public importance." Id. at 830, 94 S.Ct. at 2808 n. 7. However, the state demonstrated that the press' right to gather news at prisons could be reasonably regulated because of a strong state interest in prison security and inmate rehabilitation. The limited restrictions imposed were shown to be the minimum necessary to protect those interests. This showing is far more substantial than the majority's characterization of a "reasonable exercise of administration discretion" [10]

In *Branzburg v. Hayes*, supra, newsmen who were required to divulge their confidential sources to the grand jury asserted the newsman's privilege based in part on the press' right to gather news. The Court agreed that such a first amendment right to gather news existed, but found that the requirement to testify created only a "speculative" burden on that right. Id., 408 U.S. at 693–94, 92 S.Ct. at 2663. Moreover, the grand jury had a constitutionally mandated role in law enforcement, a "fundamental function of government." The Court concluded:

> "[W]e perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering . . . ."

Id. at 690, 92 S.Ct. at 2661.

In *McMullan v. Wohlgemuth*, supra, this Court denied a newspaper access to names on the Commonwealth's welfare rolls. We stated that the Commonwealth had a "paramount" and "compelling" interest that justified such restriction. The privacy of welfare recipients is a

10.  *Saxbe v. Washington*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), also cited by the majority, involved limited regulation of the press' access to prison inmates that "did not differ significantly" from those found in *Pell*. The Court therefore applied the same analysis in upholding such regulation.

crucial element in the Commonwealth's quest to preserve family life and to " 'encourage self-respect, self-dependency and the desire to be a good citizen and useful to society.' " We concluded:

> "The statutory limitation imposed on appellees' asserted First Amendment right to compel the disclosure of those receiving assistance is no greater than necessary to protect the substantial governmental and individual interests involved."

Id. 453 Pa. at 165, 308 A.2d at 897.

The majority cites other instances in which the press' right to access to news sources is restricted, such as grand jury hearings or some aspects of criminal trials. However, such restrictions are clearly compelled because the state must protect the defendant's constitutional right to a fair trial before an impartial tribunal. See *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L. Ed.2d 600 (1966); *Estes v. Texas*, supra. Moreover, a court violates a newsman's first amendment rights if its supervisory powers are used more broadly than required to protect those rights. See *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); *Craig v. Harney*, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).

This case, involving total secrecy, is also governed by the First Amendment of the Constitution. The court of common pleas, by impounding the disciplinary records, has restricted the rights of appellant and of the public to be informed. For this Court to sustain such an order, either the infringement must be "speculative," or the state must make a strong showing of a "compelling state interest" which cannot be adequately protected by less restrictive means. Here, neither basis for upholding the impoundment order is present.

## II

As the majority correctly notes, the courts have the power and duty to discipline attorneys practicing before

them. In fact, courts must exercise this power in order to maintain the public trust in the judicial process. In *Moyerman's Case*, 312 Pa. 555, 564, 167 A. 579, 583 (1933), we stated:

"The law is an ancient and honorable profession. Throughout its whole existence it has been maintained in the confidence of the people by the integrity of its members. . . . The practicing members of the profession are the arms of the court, which exists only for the administration of justice, and as officers of the court they are held out to the community as worthy of special trust and confidence. The court itself would fail its duty to the public if it did not, when an attorney has proved himself unworthy, withdraw its endorsement and strike his name from the rolls. . . ."

See *In re Shignon*, 462 Pa. 1, 23, 329 A.2d 235, 246 (1974).

Disciplinary proceedings are an integral part of a court's obligation to the public. They have become an increasingly important method of demonstrating the trustworthiness of the legal profession and ensuring the effectiveness of the judicial process.[11] We should there-

11. Many commentators have also emphasized that disciplinary proceedings are a crucial element of a court's obligation to the public. Cole, Bar Discipline and *Spevack v. Klein*, 53 A.B.A.J. 819, 820–21 (1967); Holland, The Objectives of Attorney Discipline: A Pennsylvania View, 79 Dick.L.Rev. 558, 568 (1975); Roberts Pennsylvania's Disciplinary Procedures for the Bar, 39 Pa. B.A.Q. 490 (1968); Wright, Self-Discipline of the Bar: Theory or Fact?, 57 A.B.A.J. 757 (1971). Wide ranging reforms have been urged because of public mistrust of the profession. See ABA Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement (1970) (hereinafter "Clark Report"); Commentary, The Bar and Watergate: Conversations with Chesterfield Smith, 1 Hastings Con.L.Q. 31 (1974); Marks & Cathcart, Discipline Within the Legal Profession: Is It Self Regulation?, 2 Ill.L.Forum 193 (1974) (reprinted by American Bar Foundation, 5 Research Contributions 193 (1974); Wright, supra.
    The Clark Report begins:
    "After three years of studying lawyer discipline throughout the country, this Committee must report the existence of a

fore scrutinize with particular care any judicially created restriction which removes disciplinary proceedings in a court of law from "the hard light of public scrutiny."

The majority's analysis fails to employ such scrutiny. It states that disciplinary proceedings are "non-governmental in nature." This assertion not only ignores the court's responsibility to the public to ensure that the proceedings are effective, but also conflicts with the obvious fact that court officials act in their official capacity when they discipline attorneys. Further, private attorneys are themselves officers of the court. *All* court actions are public property. The Supreme Court of the United States stated in *Craig v. Harney*, supra, 331 U.S. at 374, 67 S.Ct. at 1254:

> "What transpires in the court room is public property. . . . There is no special prequisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."

That Court recently reaffirmed this principle in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492, 95 S.Ct. 1029, 1044–45, 43 L.Ed.2d 328 (1975):

> "With respect to judicial proceedings in particular, the function of the press serves to . . . bring to bear the beneficial effects of public scrutiny upon the administration of justice."

scandalous situation that requires the immediate attention of the profession."
It also warns that unless the courts demonstrate the effectiveness of their policing methods, demands will be made that disciplinary proceedings be turned over to independent examiners. Clark Report, supra at 2.

The need for reform prompted the adoption of our own disciplinary rules, which were not in effect at the time of this disciplinary hearing. See Jones, State of the Judiciary, 43 Pa.B.A.Q. 292, 293–94 (1972).

Finally, the Pennsylvania Constitution states:

"The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or *any branch of government, and no law shall ever be made to restrain the right thereof.*" (Emphasis added.)

Pennsylvania Const., art. 1, § 7.

The majority, ignoring the public's right to examine court proceedings as provided in the State and Federal Constitutions, asserts that McLaughlin's (appellee's) expectation of confidentiality is a sufficiency compelling interest to impound the disciplinary records. Perhaps an accused attorney subject to a disciplinary proceeding could assert a limited interest in confidentiality, as the majority assets. However, a mere expectation of privacy by the attorney cannot justify the blanket rule of secrecy approved by the majority. It allows a court to impound its own disciplinary record after the proceedings are completed without divulging the reasons for its action, without divulging its decision and without any provision for review.[12]

The majority relies on the Clark Report [13] to support its claimed compelling state interest in confidentiality. What the committee recommends is that disciplinary proceedings be kept confidential "until hearings have been held and the charges sustained by the trial authority." [14]

12. Public confidence in the effectiveness of disciplinary proceedings would be strengthened by providing public access and judicial review. Failure to include either of these safeguards creates the appearance and danger of arbitrary abuses of discretion. See K. Davis, Discretionary Justice 102–16, 151–55 (1969).

13. See note 11 supra.

14. Clark Report, supra note 11, at 138. Holland, supra note 11, at 570 would also give a limited confidentiality privilege to protect "an attorney . . . from adverse publicity until the charges are proved or he himself requests the charges be made public."

In *Nichols v. Gamso,* 35 N.Y.2d 35, 358 N.Y.S.2d 712, 315 N. E.2d 770 (1974), the court stated that it was probably an abuse of discretion, as a "matter of public policy," absent compelling

The report is concerned with the prejudicial effect of the widely publicized filing of charges against a private attorney and the largely ignored exoneration at some later time. Although they may be legitimate concerns that require limited protection, they offer no justification for the majority's absolute rule of secrecy, which permanently impounds a court's disciplinary records even when the charges are sustained.[15]

Even if one were to accept the majority's assertion that a private attorney has a reasonable expectation of privacy which the courts are permitted to honor, appellee is no longer a "private attorney" and cannot reasonably have that expectation. Because he has accepted an appointive governmental position with extensive responsibility to the public, he is a "public official." *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45

circumstances affecting the public interest, "not to make available to public scrutiny so much of the [disciplinary] record and proceedings as bear on the charges sustained [against a trial judge]." The court also stated that there should be judicial review, particularly when "the subject of the charges is continued in office."

**15.** Many commentators question even a limited grant of confidentiality. See, e. g., Commentary, The Bar and Watergate: Conversations with Chesterfied Smith, supra note 11, at 35; Marks & Cathcart, supra note 11, at 233–34; Manning, If Lawyers Were Angels: A Sermon in One Canon, 60 A.B.A.J. 821, 825 (1974); see also Leach, The New Look in Disciplinary Enforcement in England, 61 A.B.A.J. 212–14 (1975).
Marks & Cathcart state:
"All stages of a disciplinary proceeding should be disclosed because confidentiality is incompatible with the profession's need to publicize at least its formal efforts at self-regulation, and because the nature of the proceedings (except for the confidentiality) more closely resembles a criminal trial than an informal regulatory hearing. The origins of secrecy in disciplinary proceedings are remote; perhaps they are rooted in a guild outlook. Secrecy, however, does not serve the broader professional interests. Further, there is a question whether secrecy of proceedings, at least after preliminary screenings, is consistent with the licensing rationale, which requires accountability to the public."
Marks & Cathcart, supra.
Michigan has recently made all formal disciplinary proceedings open to the public. See Marks & Cathcart, supra.

(1971); *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).[16]  This case is particularly sensitive because appellee, as assistant district attorney, is himself charged with upholding the law.  The public therefore has a strong interest in knowing appellee's qualifications and fitness for his public position.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L. Ed.2d 789 (1974); *Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964).  This interest cannot be thwarted by claiming an expectation of confidentiality.  See *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 30 n. 1, 91 S.Ct. 1811, 1814 n. 1, 29 L.Ed.2d 296 (1971); *Time, Inc. v. Hill*, 385 U.S. 374, 387–88, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967).[17]

The majority argues that the "public official" rule should not be applied here because appellee was a private attorney at the time of the disciplinary hearing.  The majority's "private attorney" rule would put a lid of secrecy on any misconduct which occurred before an official assumed his post discovered during the disciplinary proceedings.  Its rule applies even if the misconduct relates to the means by which the attorney became a public official.  Further, that appellee might once have had a right to privacy is not dispositive now;[18] the public has

16.  See also Pa.Const. art. I, § 7, which provides that no one may be convicted for publishing materials "relating to the official conduct of officers *or men in public capacity* . . . ." (Emphasis added.)

17.  Cf. *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).  Appellee's daughter, a rape victim, brought an invasion of privacy action against a broadcaster based on a state statute which provided criminal penalties against those who broadcast rape victims' names.  The Court denied relief finding that the strong privacy interest was outweighed by the press' privilege to report the events of those court proceedings.

18.  For example, the past conduct of political candidates for office is subject to the "public official" rule.  See *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971).  The reasoning of these cases is clearly relevant here.

a right to any information in the impounded record which concerns appellee's fitness for office. The Supreme Court of the United States has reaffirmed this principle:

> "[S]ociety's interest in the officers of government is not strictly limited to the formal discharge of official duties. As the Court pointed out in *Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964), the public's interest extends to 'anything that might touch on an official's fitness for office. . . . Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.' "

*Gertz v. Robert Welch, Inc.*, supra 418 U.S. at 344, 94 S. Ct. at 3009. Appellee's conduct as a "private attorney," the very concern of his disciplinary hearing, is undeniably relevant in determining his qualifications and fitness as an assistant district attorney.

Other interests noted by the majority—the reputation and livelihood of a private attorney and the rehabilitative effects of the disciplinary order—likewise fail to justify absolute secrecy of these court proceedings. The strong public interest in obtaining information concerning a public official's "fitness for office" cannot be so completely infringed by a blanket assertion of inapplicable or uncertain state interests.

Finally, the majority maintains that the state's interest in confidentiality is "vital" because, here, it serves "in assisting legitimate governmental processes." Such a broad pronouncement could equally justify secrecy in every aspect of governmental operations, a practice repugnant to our fundamental principles of self-government.

Here, unlike the uncertain impairment in *Branzburg*, there is a total impairment of the public's first amend-

ment right of access to impounded information involving a court decision. The public has a right to know, and the press a right to report, whether public servants are qualified to perform their duties and whether disciplinary procedures, important governmental and court functions, are fair and effective. The disciplinary court has imposed a drastic order of secrecy jeopardizing these rights and, by so doing, concealing what transpires in the public's courts from public scrutiny. Unlike *McMullan v. Wohlgemuth*, supra, no compelling privacy rights have been shown to exist, and, unlike the other cases relied on by the majority, no compelling state interest has been established.

This case offers no justification for erecting a wall of governmental secrecy between the court's action and the public. As Justice Brandeis stated:

> "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." [19]

It is regrettable that the majority, by condoning secrecy, makes an unnecessary and self-defeating retreat into darkness.

I dissent.

**19.** L. Brandeis, Other People's Money 92 (1914).